WhitaKER, Judge,
delivered the opinion of the court:
This case is before the court pursuant to H.R. Resolution No. 475, 83d Congress, 2d Session, by which the court has been requested to determine whether plaintiffs have a legal or equitable claim against the United States, and the amount, if any, legally and equitably due thereon, and to report its conclusions to the House.
Plaintiffs sue to recover property losses and damages sustained by them as a result of a flood on the Missouri River in the vicinity of Kickapoo Bend south of St. Joseph, Missouri. The flood in question took place in March 1949 and resulted from the melting of an ice gorge which jammed the river in the vicinity of latan Bend. Plaintiffs’ claims rest on the allegation that the ice gorge which caused the flood was in turn caused by certain pile dikes and revetments which had been negligently placed in the river by the Army *339 Corps of Engineers for purposes of flood control and navigation.
The facts of the case show that the Missouri River in its natural state was a wide, meandering, braided stream which flowed through a flood plain or valley which varied in width from 2*/2 to 10 miles. The channel was composed of numerous, shallow, interlaced streams of varying width separated by bars and islands. By the Act of January 21, 1927 (44 Stat. 1010, 1013), Congress approved a plan for the improvement of the Missouri for purposes of navigation. By the acts of August 30, 1935 (49 Stat. 1028, 1034) and March 2, 1945 (59 Stat. 10, 19), the original plan was expanded and modified to provide for both a larger and deeper navigable channel as well as a plan for flood control.
To carry out these plans, it was necessary that the Corps of Engineers narrow and stabilize the river channel. This approach is the only one that is feasible on a river such as the Missouri. It is an alluvial stream and the only way it can be harnessed is to use its inherent qualities. Thus, the depth of the navigable channel is maintained by allowing the river to scour the bottom. To accomplish this, the width of the river is first narrowed and stabilized within the flood plain by the process of accretion. This is done by the location of pile or trail dikes placed parallel to the river bank and surrounded by rock fill. The river gradually deposits sediment around these dikes and thus creates an effective dam which forces the river down the designed channel and keeps it from meandering over the entire flood plain.
At the time of the flood in 1949, the designed channel, in the area in question, was composed of three bends which formed an ox yoke. The middle link is latan Bend joined upstream by Oak Mill Bend and below by Kickapoo Bend. Running off from Oak Mill Bend and latan Bend were two natural chutes or depressions, there before the Corps of Engineers started on the project, which tended to allow the river water to bypass the designed channel. These chutes were called Oak Mill Chute, which ran off on the Kansas side, and latan Chute, which bypassed the channel on the Missouri side. To contain the river within the design channel the Corps of Engineers placed pile dikes at the head of *340 both Oak Mill and latan Chutes. At the time of the flood in the winter of 1948-1949 these dikes were not sufficiently high to dam off all of the water running into the chutes and some did bypass the design channel.
On the inner or Kansas side of latan Bend at approximately mile 422, there was a submerged pile structure, designated 43T.3L. This structure had originally been designed to contain the channel existing prior to the flood of 1943. After that flood, the river changed its course. The engineers then adopted the new course, but this left structure 437.3L, which was originally on the Missouri side, along the Kansas bank. The engineers saw no reason to remove the structure, but merely shortened it so that it protruded only a few feet into the new design channel, and not at all into the navigation portion of the channel. In this position, it supported the Kansas bank.
Along the outer side of latan Bend the engineers had constructed a long curving pile dike which paralleled the Missouri shore, which constricted the water, so that its scouring action produced the necessary depth for navigation. The 1948 hydrograph shows that there was a very good navigation channel proceeding around the bend ranging in depth from 6 to 26 feet.
The Missouri River has ice on it each year and this has been a factor in most of the early spring floods. In December 1948 the first ice block on the river was observed between mile 476.5 and 478.5 approximately 50 miles up the river from latan Bend. By January 5, 1949 the ice had moved downstream and lodged at mile 421 on latan Bend at the point where Oak Mill Chute returns to the main channel. By January 8, the ice at mile 421 moved downstream, but it continued to hold fast immediately upstream at mile 422, approximately at the location of the submerged structure 437.3L. Ice continued to form in the river and by January 11, 1949 a block of ice extended from mile 421 to mile 434.5. There were also four other blocks of ice further upstream at this time. On January 15 and 16 various blocks of ice moved downstream and gorged at mile 422. This gorge held fast and by January 31 the ice had extended up the river for some 100 miles.
*341 There was little movement of the ice gorge after this time until March. In February, the engineers made an effort to dislodge it with explosives, which proved unsuccessful. In late February, the weather warmed and the tributary streams began to thaw and rise, some even flooded. The Corps of Engineers issued flood warnings daily and advised all residents that when the ice moved out water levels would be unpredictable.
On March 6, 1949, at 3:45 a.m. the lower end of the ice from mile 422 to mile 428 went out; at 8:00 a.m. the block from mile 428 to 430 went out; and by 9:30 a.m. the rest of the long jam began to move. It was at this time that the flooding occurred on plaintiffs’ properties.
Plaintiffs base their legal claims on two theories: first, that the flooding constituted a taking compensable under the Fifth Amendment; or, second, that the flooding was a tort, damages for which are allowable under the Federal Tort Claims Act, 28 U.S.C. 1346(b). In the alternative, the plaintiffs say that they are equitably entitled to recover, since the defendant’s negligent construction and maintenance of the dikes and revetments at latan Bend were the proximate cause of the ice gorge and, consequently, of their injury.
It seems clear from the record that plaintiffs do not have a legal claim against the United States. Certainly the defendant’s actions do not constitute a taking under the Fifth Amendment. It is well settled that consequential damages form no basis for such a recovery. To constitute a taking there must be an intent on the part of the United States to take plaintiffs’ properties, or, at least, an intention to do an act the natural consequences of which was to take the property. Here, however, the récord clearly shows that the defendant’s acts were designed to protect plaintiffs’ private properties, not to take them; nor can it be said that the natural consequences of these acts would result in a taking of their properties for public use. Sanguinetti v. United States, 264 U.S. 146; Columbia Basin Orchard v. United States, 132 C. Cls. 445; Crites v. United States, 132 C. Cls. 544; Coates v. United States, 124 C. Cls. 806; Yazel v. United States, 118 C. Cls. 59. One flooding does not constitute a taking and the plaintiffs have failed to show by their evi *342 dence that the flooding which occurred in 1949 will inevitably recur. This fact is essential to prove a taking. North. Counties Hydro-Electric Co. v. United States, 138 C. Cls. 380, cert. denied 355 U.S. 882.
Nor have plaintiffs a legal claim under a tort theory of recovery. In providing for a broad plan of flood control on the Mississippi River and its tributaries, of which the Missouri River is one, Congress specifically provided that “No liability of any kind shall attach to or rest upon'the United States from any damage from or by floods or flood waters at any place.” 33 U.S.C. § 702c. This long established policy of non-liability is bottomed on public policy and not sovereign immunity, but, at any rate, it is a withdrawal of consent to be sued in such cases, if it can be said that such consent had previously been given. Grant v. Tennessee Valley Authority, 49 F. Supp. 564. We agree with the Eighth) Circuit Court of Appeals that this section was not intended to be repealed by the enactment of the Federal Tort Claims. Act. See National Mfg. Co. v. United States, 210 F. 2d 263, where the question is fully and ably discussed.
We come, then, to the final question before the court, which is whether the plaintiffs have an equitable claim against the-United States. The word “equity” in this context is used in the sense of broad moral responsibility, what the Government ought to do as a matter of good conscience. Georgia Kaolin Co. v. United States, 145 C. Cls. 39, Gay Street Corp. v. United States, 130 C. Cls. 341. Under even this theory, however, defendant’s liability must rest on some unjustified act or omission to act which caused plaintiffs’ damage; otherwise any award would be a pure gratuity.
In reviewing the record, we do not believe that it shows the defendant was at fault. The ice gorge at mile 422 was caused by many factors over which the defendant had no-control. The combination of weather, water velocity, stream gauge, and wind all contributed substantially to the formation of the jam. The facts show that the normal daily discharge of water passed St. Joseph, Missouri, some 20 or so miles upstream, which normally amounted to some 36,000> cubic feet per second, had dropped to only 6,880 c.f.s. on January 3, 1949, due to ice on the tributaries, low rainfall* *343 and other factors. This unusually small flow, not only made the river shallower than usual, but also greatly reduced its velocity. This fact alone substantially contributed to the gorge, since the shallower and slower the water, the easier it is for it to freeze.
The plaintiffs say that the defendant caused the ice jam because it did not remove structure 437.3L from its place on the inner bank of latan Bend. We disagree. This structure did not cause the gorge. Its removal would not have prevented the inner bank of the bend from shoaling, which is inherent in an alluvial stream. The current being slow at the shoals, sediment is continually deposited and when the ice comes down the river it catches on these shoals and might create a jam, whereas swift water carries the ice on down the stream. This shoaling was, without doubt, one of the causes of the gorge, and there would have been shoaling at this point even if the defendant’s structure 437.3L had been entirely removed.
Nor do we believe that the plaintiffs can complain because the pile dikes across the head of Oak Mill and latan Chutes did not completely block the flow of water into these old channels. The only practical way these channels could be effectively blocked was through the slow process of accretion, without incurring prohibitive expense. The defendant was not negligent because the river had not deposited enough sediment to form a dam.
Basically, plaintiffs’ claims are bottomed on the theory that, if the defendant had made no effort to improve navigation and flood control on the Missouri, the ice would not have gorged in the particular spot that it did on latan Bend. This may or may not- be true. However, we do not believe it is relevant. The United States has a constitutional right, even a duty, to improve navigation and protect against floods, for the benefit of all of its citizens who are affected thereby. To say that, if it does enter into plans of improvement, it will stand liable for damage regardless of negligence would be an absurd rule, and one contrary to the expressed will of Congress embodied in the provision quoted above, 33 U.S.C. § 702c. The general welfare of its citizens demands the Government’s participation in these navi *344 gation and flood control projects; without it, the control of floods would be impossible.
We must conclude, on the basis of all the facts, that the United States is not equitably responsible for the plaintiffs’ damages, since it is in no way at fault.
This opinion, together with the findings of fact which follow, will be certified to the Congress pursuant to House Resolution No. 475,83d Congress, 2d Session.
It is so ordered.
Barksdale, District Judge, sitting by designation; Lara-more, Judge; Madden, Judge, and Jones, Chief Judge, concur.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. On March 15, 1954, H. R. 8404 was introduced in the 83d Congress, 2d Session, which bill was entitled: “A bill for the relief of the B Amusement Company (Robert H., J. C., Kenneth, and Mrs. J. R. Bowers) and others.” Thereafter, on March 16, 1954, H. Res. 475, 83d Congress, 2d Session, was introduced and passed the House on April 26,1954, providing as follows:
Resolved^ That the bill (H. R. 8404) entitled “A bill for the relief of B Amusement Company (Robert H., J. C., Kenneth, and Mrs. J. R. Bowers) and others,” together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
2. H. R. 8404, 83d Congress, 2d Session, provided in part .as follows:
Be it enacted by the Senate and House of Representar tires of the United States of America m Congress assem *345 bled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the claimants hereinafter named, the sums hereinafter specified in full satisfaction of their respective claims against the United States for compensation for property losses or damages sustained by them as the result of a flood of the Missouri Elver, in the vicinity of Kickapoo Bend, south of Saint Joseph, Missouri, in the months of January through March 1949, which flood resulted from an ice gorge which was caused by the existence of pile dikes constructed and placed in the Missouri Eiver between Kickapoo Bend and latan Bend by or under the direction of the Corps of Engineers of the United States Army: * * *
3. The bill quoted above contained the names of 33 plaintiffs. Plaintiffs’ petition embodies the claims of 32 claimants, that of Mitchell T. and Catherine Thomas being omitted. One plaintiff’s claim, that of Flossie F. McQueen, No. 27 in the petition, was dismissed by plaintiffs’ counsel at the trial. A motion for substitution of parties, due to the death of original plaintiffs numbered 14 and 32 in the petition, was allowed by the court on November 13, 1957. The claim of each plaintiff is taken up in the section of this report entitled damages, beginning at finding 28. The petition claims total damages of $279,031.18.
4. By act of January 21, 1927 (44 Stat. 1010, 1013), the Congress approved a plan for the improvement of the Missouri Eiver to provide for the establishment of a 6-foot navigable channel, 200 feet wide, from Sioux City, Iowa, to the mouth of the river near St. Louis, Missouri. The plan was set forth in a report furnished by the Corps of Engineers (H. Doc. 1120, 60th Cong., 2d Sess.). This was the first provision for extensive improvement work to be done by the Corps of Engineers on the Missouri Eiver above Kansas City. However, appropriations had been made as early as 1832 to remove snags and as early as 1876 to do some rectifying work on the Missouri Eiver from Sioux City to the mouth. Early rectification work was done under the charge of the Missouri Eiver Commission.
5. By act of August 30, 1935 (49 Stat. 1028, 1034), the Congress approved an enlarged plan for the improvement of the Missouri Eiver to provide for a 6-foot navigable *346 channel, 200 feet wide, from Sioux City to the mouth, and to provide for flood control for the whole of the Missouri Biver Basin in accordance with the report furnished by the Corps of Engineers (H. Doc. 238, 73d Cong., 2d Sess.).
6. By act of March 2,1945 (59 Stat. 10,19), the Congress approved a revised plan to provide for flood control and to increase the navigation channel on the Missouri River to a 9-foot channel, 300 feet wide, from Sioux City to the mouth, in accordance with the report furnished by the Corps of Engineers (H. Doc. 214, 76th Cong., 1st Sess.).
7. The Missouri River, in its natural or wild state before any improvement works were commenced, was a wide, meandering, braided stream flowing through an easily erodable valley. A braided channel is one composed of numerous shallow interlaced channels separated by bars and islands. The channel of the stream meandered across the valley floor or flood plain which would measure in places from 21/2 to 10 miles wide. The width of the channel would vary from place to place from 600 feet to as wide as a mile from normal high bank to normal high bank. In many locations the main channel of the stream was braided. The course of the channel frequently followed very sharp bends as it meandered across the floor of the valley or the flood plain.
8. The river improvement works contemplated the development of a stabilized channel of a designed width and depth. The channel training and stabilization works are carried on by using the inherent conditions of the river. Pile dikes, also called trail dikes, pile revetments and standard dikes are the instruments generally used in the river training work. Pile dikes or trail dikes are constructed of rows of small clumps of piles driven into the river bed in an established alignment along the river bank or designed bank and tied together by stringers. In the past the river bed was covered with a woven mattress of boards or willows to prevent scouring at the point where the piles were placed. More recently the same purpose is served by placing rock fill at the base of the piling to prevent scouring. The function of the pile dikes or trail dikes is to slow the current of the river as the water passes between and around the *347 piling and thus cause a deposition of silt which builds up a bar or the river bank by accretion at those points. The rock fill also aids in the same function. The amount of rock fill used around the piling depends upon the depth of the water in which the structure is placed. The depositions made by the river are generally slow, steady, and grow by a continuous process. Therefore, in deep water the rock fill is brought up slowly. The first rock fill is made at the base of the piling and left there until the accretion is built up to near the level of the rock fill. Then more rock fill is put in place so that the deposition will continue until the bank behind it is brought to the designed height. The rock fill is pervious, permitting water to pass through it, thus encouraging the depositions of sediment and the creation of a bar or a river bank by accretion in back of the structure. The pile dikes may extend for several thousand feet. One pile dike in the vicinity of latan and Kickapoo Bends was 8,000 feet long. Those dikes are designed to tie into and work in connection with other structures, such as spur dikes and baffle dikes. Spur dikes are built out from the banks of the river and serve to slow the river along its banks and encourage the deposition of silt. Baffle dikes are built out from the bank to tie into trail dikes and help reinforce the trail dikes and they, in turn, also encourage deposition of silt. The design and use of the river training work described, because of the power and force of the river, is more of an art than a science. It is performed “more by coaxing rather than by force.”
9. The Missouri Biver is a sediment-carrying stream. It picks up materials from the bed of the stream and carries them in suspension. The condition of the bed of the river is thus constantly subject to change. The condition of the bed of the river is studied by those responsible for designing and carrying out the river improvement and stabilization works. For this purpose soundings are taken to determine the depth of the water flowing in the river. These soundings are generally made at 500-foot intervals across the bed of the river. Surveying instruments are used to establish and mark the location of the boat from which the soundings are made. If there are changes noted in the soundings of the bed of the *348 river, the distances between sounding ranges will be closer than 500 feet apart. As the boat proceeds across the river from bank to bank, the soundings are recorded as often as the operators can possibly manipulate the sounding pole or lead line. All the channels along the course of the river, wherever it is possible to take a boat, are surveyed in this fashion. In fact, the soundings are sometimes conducted by wading the stream or watered area. The soundings so taken are then plotted in their correct correlative position on a map referred to as a hydrograph. Hydrographs are made every 2 years. After the soundings are placed on the hydro-graphs, contours are drawn to show the various depths of water. In this case the hydrograph also records the date the soundings were made and the gage readings and the flow or discharge of water in the stream at St. Joseph and other gaging stations at the time the soundings were made. The hydrographs also show the structures which are located along the stretch of the river under consideration, whether such structures be visible to the eye or are known to exist below the surface of the water. The hydrographs also show whether there is rock fill or matting in or behind the structures.
10. latan Bend in the Missouri Biver is located between miles 419 and 423 at one of the narrowest points in the flood plain, it being only about 2yz miles wide. In the sinuous course of the river, latan Bend is joined at either end by Oak Mills Bend and Kickapoo Bend. Oak Mills Bend is immediately upstream from latan Bend. The river flows from Oak Mills Bend through latan Bend and continues down into Kickapoo Bend. The earliest survey, being the map of 1879, represents the river channel as flowing along the southerly or Kansas bank to approximately mile 424, then turning abruptly at approximately a 90-degree angle to follow a north, northeasterly course across the flood plain only to double back at approximately a 45-degree angle to flow almost due south and recross the flood plain, at which point the channel appears to fan out and become extremely braided and interlaced, being interspersed with bars, islands, and sloughs.
*349 11. A map in evidence and based on the 1930-34 survey reflects the effects of the river improvement and stabilization works at latan Bend. The channel of the river appears to have been constricted and a gradual or flattened bend replaces the braided crossing and recrossing of the river previously described. The boundary line between the States of Missouri and Kansas is represented on the 1930-34 survey by a line which presumably followed the course of the river as represented on the 1879 survey. However, the main channel or thalweg of the stream appears in the 1930-34 survey to flow south of the Kansas State boundary but on the north side of training structures 437.3A, B, C, D, E, F, and G. The 1930-34 survey represents the channel in the general area as braided and interlaced and as being interspersed with bars and islands.
12. The 1941 hydrograph represents the main channel of the river as turning at mile 423 and flowing more to the south than it did in the 1930-34 survey and crossing between structure 437.3D and the beginning of structure 437.3E, at approximately the place indicated on the 1930-34 survey by the brackets and legend “removed 1935.” The 1941 hydrograph represents the channel of the river then flowing next to and immediately west of or on the Kansas side of a long structure labeled 437.3L, which was installed on the Missouri side of the river. The main course of the channel is shown west and considerably south of the training structures 437.3E, F, and G. The channel, which was represented as the main channel on the 1930-34 map, appears on the 1941 hydro-graph to be a minor chute heading off the north and east side of the main channel at mile 423 and being to some extent a modified extension of the direction the stream was following before it curved to the south. This chute is called latan Chute. This chute also bends to the south and reenters the main channel between mile 419 and 420. The hydrograph also shows a series of chutes leaving the south side of the main channel on the Kansas side, at a point slightly upstream from the head of latan Chute and reentering the main channel across from mile 421. This series of chutes is called Oak Mills Chute. Pile dikes, such as described in finding 8, *350 were represented as having been placed across the head of both latan and Oak Mills Chutes.
13. There was a severe flood in 1943 which destroyed a large part of the structures labeled 437.3K, J and L and 437.2B, which had been placed to hold the river within the then designed channel. A revised plan was developed to hold the river in the new position it had established. The main channel was now on the east or Missouri side of the remaining part of structure 437.3L. Plaintiffs’ expert thought this effect of the flood could have been prevented with proper maintenance but that the location of the new channel would be just as good as the old for navigation. Structure 437.3L was shortened considerably but not removed because it was almost all outside the new designed channel and now served a function of protecting the Kansas bank from further erosion. The structure did not interfere with navigation. The new channel of the river thus created by the flood and sought to be stabilized by defendant contained a so-called oxbow which had a tendency to decrease the velocity more than a straight or nearly straight stretch of channel would have done. This was good for navigation but had no benefits for flood control. The river contains many such oxbows and there were even more in its wild or unimproved state.
14. A comparison of the hydrographs for 1944, 1946, and 1948 shows the progressive development and stabilization of the designed channel of the Missouri River at latan Bend after the flood of 1943, up to and including November 14, 1948. The 1944 hydrograph shows that structures 437.2B and 437.3A were in place across the head of Oak Mills and latan Chutes. The hydrograph of 1946 shows that the beginning of structure 437.2B remained in place at the head of latan Chute but was lengthened and extended downstream to a point across the river from submerged structure 437.3L. Structure 437.3A remained across the head of Oak Mills Chute. Construction of dike 435.3 and trail dike 435.3A had been commenced downstream at the lower part of the mouth of Oak Mills Chute on the west or Kansas bank of the main channel. The 1948 hydrograph, which represents the condition of the river as of November 14, *351 1948, showed that the beginning of structure 437.2B was rock filled to 1 foot above o. R. p., which means 1 foot above low-water mark, and the structure was further extended downstream and reenforced with mattress. Structure 437.3 remained in place. A spur dike had been constructed between structure 437.3 and trail dike 435.3A across a part of the mouth of Oak Mills Chute. The soundings appearing on the 1948 hydrograph show that there was a very good channel proceeding around the bend ranging in depth from 6 to 26 feet at a time when the gage reading at St. Joseph was 8.8 feet and the discharge at St. Joseph was around 38,000 and 39,000 c. f. s.
After there was sufficient accretion behind the structures which had been placed at the head of each chute, both latan and Oak Mills Chutes were blocked off with a rock-filled dike to stop the flow of any water through them. This did not occur until some time after the 1949 flood.
15. The Missouri River has ice in it every winter, at least 24 inches in depth, and this has been a factor in many or most early spring floods on the river. Ice forms in below freezing weather. Ice cakes are formed from the slush and from ice forming along the shore and in shallow water. Sometimes these ice cakes grow rather large. When 80% or more of the stream is filled with floating cakes of ice and freezing weather continues, the cakes may freeze together causing bridges of ice or jams, blocks, or gorges. Most of the evidence in this case concerns a so-called “ice gorge.” By this term it is intended here to convey the thought that ice has stopped flowing in the river and there is little or no movement of the ice other than adjustments caused by pressures. The channel is constricted by an ice gorge. The evidence conflicts on the point of whether water continues to flow under a gorge. The weight of the evidence is that if any water does flow under an ice gorge it is very little and, in any event, quite insufficient to thrust the channel clear of the ice blocking it. That was the situation in this case. It is found that no one thing can be said to cause a gorge or did cause the gorge described in these findings. In a given situation a gorge may be triggered by any one or a combination of things such as obstructions in the channel, bars, shoals, crosswinds, a nar *352 rowing of the width of the stream or a shallow place in it where ice may drag. A drop in the flow of water in the river which reduces its velocity would contribute to an ice jam or gorge. This is especially true in freezing weather when the flow from smaller tributary streams is reduced or when there has been a reduction in rainfall. Patrols are maintained by the Army Engineers to watch the behavior of ice in the river. Interested private citizens also report on such conditions to the authorities and did so in this case.
16. The record contains much detailed evidence about the amount and location of ice in the river during the winter season of 1948-49. Stated briefly, the first ice block in the Kansas City District of the Army Engineers was observed on December 27, 1948, between mile 476.5 and 478.5. By December 31, 1948, this block was about 10 miles long. On January 3, 1949, two additional blocks were observed upstream, each about 5 miles long. On January 5, 1949, the ice which had moved downstream lodged at about 1,500 feet below the intersection of dike 435.3 and trail dike 435.3A below the mouth of Oak Mills Chute or across from mile 421. Additional ice came downstream and backed up to just below Atchison where the water then rose by January 7, 1949, to only 3 feet below flood stage. Some of the ice moved out the following day as far up as mile 422 where it remained fast at approximately structure 437.3L. Witnesses walked across the river on the ice which at this point formed an effective dam or gorge.
17. Ice continued to form in the river and by January 11, 1949, a block of ice starting at mile 421 extended upstream to the Atchison railroad bridge at mile 434.5. Between that point and St. Joseph farther upstream four other ice blocks were observed. On the following day two additional blocks formed, each several miles long, extending to just above St. Joseph. Various blocks of ice moved down the river on January 15 and 16 toward mile 422 where it had gorged at the approximate location of structure 437.3L. By this time the gage at Atchison was 5.6 feet above flood stage and lowlands were flooded in that area. On each successive day the block of ice in the river extended farther upstream so that by *353 January 31 the river was completely covered to the limits of the Kansas City District at Bulo, Nebraska, at mile 514.8, a distance of 93 miles. There is credible evidence that the block of ice at this time was actually 105 miles long.
18. Defendant attempted on February 6, 8, 9, 10, and 11, 1949, to break up the ice gorge at mile 422, the approximate location of structure 437.3L, by the use of 7 tons of explosives. About 1,000 feet of ice was loosened in this manner and went downstream. However, other than as stated, the blasting was ineffective. One of the witnesses, who was in the party blasting the ice, fell through an airhole in the ice and almost drowned. This accident was immediately over the navigation channel and near the head of the latan Chute at mile 423 and between structures 437.3A and 437.2B. This indicates that there was water under the ice at that point, approximately where it was draining into the chute to bypass the gorge. The ice, however, appeared to be largely grounded from about that point to mile 421 or 422, as the blasting was generally ineffective at points below the scene of the accident, as noted above, and the river was flowing through its old channels, latan and Oak Mills Chutes, on either side of the navigation channel. There was no ice in the chutes because it was strained out by the piling at their entrances.
19. In late February 1949 the weather warmed and the tributary streams began to thaw and rise. Many of them flooded. The Corps of Engineers issued radio broadcasts several times daily warning residents in the Missouri Biver Valley that, if a general ice movement occurred, water levels would be unpredictable, and that they should be alert to the danger of flood. Defendant maintained evacuation equipment on both banks of some areas likely to be flooded. Ice and water moved downstream. On March 6,1949, the lower end of the ice from mile 422 to mile 428 went out at 3:45 a. m. At 8: 00 a. m. a block from mile 428 to 430 went out and by 9:30 a. m. other parts of the long jam began to move downstream although various blocks remained in scattered locations until the following day. The final phase of defendant’s emergency flood plan which included patrol of the river conditions 24 hours a day remained in effect from January 15 to March 11,1949.
*354 20. There were no records maintained prior to 1932 of ice jams on the river but since that time there have been ice jams in the area of latan and Kickapoo Bends in 1934 and 1952, as well as in the winter of 1948-49. These jams all caused floods. The 1934 flood and jam was caused by dikes placed in the river by the defendant in such a manner as to constrict it and cause it to clog with ice and debris. A United States district court found this to be the fact (Kuhnert v. United States, 36 Fed. Supp. 798, 127 Fed. (2) 824). At that time latan Chute was the main channel of the river. In 1941 the main channel location had changed, as noted in finding 12, and in 1943 a flood again changed the course of the river and the position of some of the structures at latan Bend, as heretofore noted. Some of the conditions in 1952 were also different from those in 1934 and 1948-49 and the main ice jam in 1952 was from mile 386 to mile 425 mostly below latan Bend. It is found that the circumstances of these three ice jams and floods are different and cannot be attributed to identical causes. The conditions at latan Bend are different now from what they were at the time of the three previous ice jams or gorges in the area. A gorge is now less likely, assuming proper maintenance of existing structures. Structure 437.3L, the shoal and oxbow are all still there and conceivably could trigger another gorge, but the entrances to the Oak Mills and latan Chutes have been effectively sealed so that all of the river is confined to the main channel as plaintiffs say it should have been in 1948-49. Some levees have also been constructed since 1949. No conclusion, therefore, can be drawn from the evidence and stated as a fact that it is inevitable another gorge and flood will occur at this point, absent a recreation of conditions exactly as they appeared previously, including weather conditions.
21. The Missouri Fiver throughout its history has been a winding, alluvial stream although there is evidence that it is now, assisted by man as well as by natural forces, changing its character and tending to be straighter. Its character and the efforts to stabilize it and to establish a satisfactory navigation channel, as required by law, have been described above. The stream has been straightened in many places, chutes or iside branches or channels eliminated and its velocity has been *355 increased. At latan Bend the changes made in the river have been considerable, as noted. It is found that a well-developed and stabilized navigation channel is as good or better for getting rid of excess water or ice than more than one channel, such as in the river in its wild state. Such a channel makes it possible for the increased volume and velocity of water to scour out a channel deep enough to be effective for flood control as well as navigation.[1] The channel at latan Bend was not fully stabilized and the improvement works there were not fully completed in the winter of 1948-49. It was, however, a better channel at that time than in its wild state for the improved channel had more velocity and was deeper than a series of shallow, crooked, braided channels which would have been just as likely, if not more likely to gorge with ice.
22. Weather, channel velocity, stream gage and wind conditions were such that it was inevitable that a severe concentration of ice would occur at latan Bend on or about when it actually did. One of the important contributing factors to the gorge was the shoal condition on the inside of the bend. Such a condition is typical on the inside or convex side of a river bend. Whether this shoaling was aggravated by defendant leaving structure 437.3L in the river at this point, is a matter for speculation. The fact is that defendant had no objection to the shoal which at this point tended to narrow the stream and create a better navigation channel off the end of the structure which protected the Kansas bank. The weather conditions were ideal for causing ice jams in the winter of 1948-49 and there were many on the Missouri Biver and its tributaries. A comparison of temperature readings for a 22-year period from 1935-57 shows that the winter of 1948-49 had the greatest number of degree days below freezing of any of the other years, although some of the days in earlier years were colder than in 1949.
23. When the ice on the river and its tributaries began to thaw there was an unusually high flow of water on March *356 5, 6, 7, and 8, 1949. On March. 5, 1949, the discharge of water at St. Joseph suddenly increased from 40,000 c. f. s. to 85,000 c. f. s. On March 6 the discharge rose to 130,000 c. f. s. and on March 7 it reached 165,000 c. f. s. Eventually it got up to 170,000 c. f. s. on or before March 8. There would have been a flood regardless of the ice gorge at latan Bend. However, the presence of the gorge added about 3 feet to the crest of the flood at Atchison and 1 foot at St. Joseph, both upstream from latan Bend. It is not established by the evidence how much, if any, this increase in the flood crest added to the damage suffered by plaintiffs.
The discharges of water by St. Joseph at the time of the flood should be compared to the discharges there just before and at the time of the creation of emergency ice conditions on the river. The river was quite low on December 15, 1948, when there was a discharge by St. Joseph of only 11,700 c. f. s. The daily discharge for the 21 years previous to that was 36,000 c. f. s. By December 28, 1948, the discharge had dropped to only 9,050 c. f. s. On January 3,1949, it was down to 6,880 c. f. s. This shallow water contributed to the ease with which the river froze. Thereafter, the discharge rose slightly and fluctuated between the low stated and a high of 46,000 c. f. s. before the big breakup. The gage reading at St. Joseph was at a low of 1.25 feet on January 3 and when the breakup was in progress on March 6, 1949, it shot up to 19.83 feet.
24. Plaintiffs have suggested that defendant had the power to control the discharge of water at Fort Peck Dam and de-' fendant intentionally cut down on the discharge at Fort Peck Dam to save water for navigation during the months of river traffic, thus leaving the river at low stages to freeze. As a matter of fact, it takes about a 22-day period for water released from Fort Peck Dam to reach St. Joseph. Considering this differential in time, the releases of water at Fort Peck Dam for the critical period involved during the ice jam exceeded the natural inflow into Fort Peck Reservoir. In general terms, the discharge at Fort Peck Dam was regulated to release about 7,500 c. f. s. to 9,000 c. f. s. of water daily during the critical period, whereas the inflow ranged , to as low as 3,500 c. f. s. and never exceeded 6,000 or *357 7,000 c. f. s. Since the 1949 flood, various additional reservoirs have been established upstream by defendant as a part of its overall continuing program for the development of navigation, irrigation, reclamation, and flood control in the Missouri River Basin. These reservoirs decrease the prospect of floods on the river.
25. Plaintiffs plead that the creation of a navigable channel in the manner pursued by defendant is inconsistent with flood control and that the ice gorge and flood in question could not have occurred in the river in its wild state for, when ice jams came, the flow of water would be able to go around them through chutes, relief channels and low ground adjacent to the river, but that defendant prevented this by structures in the river obstructing the flow of ice and water, creating shoals, an oxbow bend, and making inevitable a choke in the stream which would bring a gorge at the first good opportunity. Findings have been made above with reference to these allegations.
Plaintiffs also contend that had the pile dikes or trail dikes at the heads of latan and Oak Mills Chutes been so constructed that water could not have escaped from the main channel into these old abandoned channels there would have been sufficient velocity and volume of water to prevent the ice from becoming stranded in the main channel, and that the main channel would have scoured instead of becoming gorged. Plaintiffs say that no water flowed under the gorge in the main channel but that it all strained out between the piling at the heads of the chutes and bypassed the gorge and that the ice could not follow the water because the piling at the chute heads kept it out. This is, in effect, what happened as found above, although there may have been insignificant amounts of water under the main ice gorge. The dikes were not completely plugged against leakage until later. Plaintiffs contend that this demonstrates improper maintenance thereof by defendant. It was not inadequate maintenance that accounted for the fact that the entrances to the chutes were not completely blocked and water could strain through into them. The policy of defendant, dictated by sound engineering practice, was to close the chutes gradually by a buildup of sediment and rocks around and behind the *358 piling so that an effective dam would be created. To have closed the chutes with dams, without doing as described, would have created an impossible maintenance problem and the river would have doubtless cut around the dams and gone into the chutes anyway, according to defendant’s engineers who felt it would at that time have been dangerous to close them.
The buildup of the river bank is a progressive matter and must be established gradually. Unfortunately, the gorge and flood came at a time before the works of the defendant had been completed at latan Bend. But for this, it is unlikely a gorge would have occurred just where it did. Plaintiffs say that this should have been anticipated and dredging used to deepen the main channel. Defendant gave consideration to this but rejected dredging as too expensive and as having only a temporary effect in such a stream as the Missouri River. Actually, the bed of the latan Chute was higher than that of the main channel and entrances to the chutes had been closed to the point where they carried little water in early January 1949 when the river was at a low stage. The low stage of the river at the critical time had more to do with the creation of the gorge than the condition at the heads of the chutes. To this the existence of structure 437.3L was also a substantial contributing factor, as was the natural shoal at that point, the weather, and other factors with reference to which findings have heretofore been made.
DAMAGES
26. At the trial of this case the parties entered into a stipulation, supplemented later by one filed with the clerk, to fix the fair and reasonable value at the time of the 1949 flood of certain crops involved in some of the claims.
On the basis of this agreement, wheat is determined to be $56 per acre, figured at the rate of 35 bushels of production per acre at $1.60 per bushel for owners. For tenants wheat is 35 bushels per acre at $1.40 per bushel but a tenant’s one-half interest would be $24.50 per acre.
It was further stipulated that where an owner and a tenant are both claimants, the shares shall be figured on the basis of $1.40 per bushel or $24.50 per acre for the tenant, but that the owner’s share shall be based upon $1.80 per bushel, *359 which is equivalent to $63 per acre, or $31.50 for his one-half share.
Growing corn is $40 per acre, which is rental value for one crop year. Corn in the crib is $1.17 per bushel. Alfalfa is $20 per acre; hay $0.70 per bale. A tenant claiming a one-half interest in these crops is to have the value thereof figured on the basis of one-half of the agreed figures for corn, alfalfa, and hay.
Plaintiffs’ claims will be considered in the order and by the numbers of which they are designated in the petition. Plaintiffs have itemized their alleged losses in the appendix to the petition. To avoid unncessary repetition these items will not be fully repeated in the findings of fact but are here incorporated by reference where omitted.
27. (1) B Amusement Co. (Kobert H., J. C., Kenneth, and Mrs. J. B. Bowers), R. r. d. 6, St. Joseph, Missouri. This plaintiff had a concession at Lake Contrary Park and as a result of the flood of 1949, which is the subject of these findings,[2] suffered damages in the loss of buildings, equipment and merchandise as described in the petition. Plaintiff claimed $1,887.50 in the petition but modified this at the trial to a total of $1,879.59. It is found that plaintiff suffered damages in said amount as a result of the flood and that the valuation is fair and reasonable.
28. (2) Synthia A. Bailey, e. f. d. 5, St. Joseph, Missouri. This plaintiff had a freehold in certain land described in the petition and as a result of the 1949 flood described above suffered damage to two houses and their contents, an auxiliary building and a cave and to the loss of com in the crib and to corn and alfalfa land.
Based on the above stipulation and on the evidence, it is found that plaintiff, who claims $6,216 in the petition, suffered damages of a fair and reasonable value as follows:
76 acres eornland @ $40_$3,040
6 acres alfalfa land @ $20_ 120
200 bushels corn in crib @ $1.17_ 234
Damage to 2 houses and contents__ 575
Damage to cave and contents_ 225
4,194
*360 29. (3) Mrs. J. R. Bowers, r. f. d. 0, St. Joseph, Missouri. This plaintiff had a leashold described in the petition and as a result of the 1949 flood suffered damage to her residence and auxiliary buildings and their contents. It is found that this damage is the amount of her claim, $713, which is fair and reasonable.
30. (4) Ruth E. Brady, St. Joseph, Missouri, was the owner of several hundred acres of land damaged and destroyed by the flood of 1949. Her house was washed off its foundation and 2 barns were completely demolished. She also lost 10 acres of alfalfa, 200 of wheat, 125 acres of corn and 50 tons of hay. She claims $19,650, which is found from the evidence to be the fair and reasonable value of her damage resulting from the flood.[3]
31. (5) Paul and Gertrude Calvert, Weston, Missouri, had a leasehold in certain land described in the petition and located in Platte County, Missouri. Part of this land was accreted. As a result of the flood they suffered the loss of a one-half interest in 40 acres of growing wheat for which $1,600 is claimed. The value of the total crop, based on the stipulation, is found to be $1,960 and plaintiffs’ interest $980, which is the fair and reasonable value of plaintiffs’ damage and loss.
32. (6) Robert E. and Nora B. Christie, r. f. d. 6, St. Joseph, Missouri, had a freehold in Buchanan County, Missouri, as described in the petition. As a result of the 1949 flood, which is the subject of these findings of fact, these plaintiffs suffered damages and claim $4,650. They lost 20 acres of land of a value of $800, 30 acres of wheat, 10 acres of alfalfa, 250 bales of hay, and 150 bushels of com in the crib. There was also $67 worth of damage to an automobile. The fair and reasonable value of the damage to these plaintiffs is found to be $3,097.50.
33. (7) Joseph W. and Dorothy St. John Connor, Sugar Lake, Rushville, Missouri, owned certain property described in the petition and damaged by the flood of 1949. Mr. Connor is now deceased and Mrs. Connor is the sole owner of the property by virtue of survivorship. The claim in the *361 petition is for $3,143.84, amended to the reduced sum of $2,793.84 by plaintiffs’ counsel at the trial. Plaintiffs lost 9 acres of winter wheat worth $504. There was damage, also, to 4 dwellings. Plaintiffs spent $880.73 for repairs on these buildings, as evidenced by cancelled checks. She testified that she spent much more. It is found that a total of $2,667.84 is the fair and reasonable value of all of the losses suffered by the Connors as a result of the flood.
34. (8) John H.[4] and Frances F. Cook, Kansas City, Missouri, owned approximately 920 acres in Buchanan County, Missouri, which they valued at $125,000 just prior to the 1949 flood. Twenty acres of this were covered with sand and silt by the flood and made unproductive. The value of this acreage was $2,720. Plaintiffs lost a one-half interest in 340 acres of growing wheat worth $10,710. There was $4,000 in damage to the residence, $315 in damage to the garage and walk, $1,800 worth of fence was destroyed, a haybarn worth $2,775 and a henhouse worth $125. Plaintiffs also lost a 300-gallon steel oil storage tank which they valued at $300. It was washed onto the farm of a neighbor. Plaintiffs made no effort to get it back. Plaintiffs claim $64,883 in damages. It is found that the fair and reasonable value of their damage is $22,445.
35. (9) Plaintiff Donald Cox, k. e. d. 6, St. Joseph, Missouri, was owner of a lot in Buchanan County, described in the petition, and on which was located a house and tavern which suffered damage in the 1949 flood. He claims $5,240.32 for this damage, including loss of merchandise, moving of certain equipment, loss of business and loss of 2 cocker spaniels. It is found that the fair and reasonable value of his damage was $3,958.32. As is true with most of the plaintiffs, the evidence about Mr. Cox’s losses was based largely upon his own credible and uncontradicted testimony and not upon any documentary evidence or the evidence of experts. His records were destroyed in the flood of 1952. Much of the work of restoration he did himself. No allowance is made for the claimed loss of business, which is specu *362 lative and consequential, or for tbe loss of the 2 dogs, the cause of their disappearance being uncertain.
36. (10) Plaintiff Jack Cummings, Rt. 2, Rushville, Missouri, had a freehold in Buchanan County, described in the petition, and as a result of the 1949 flood suffered damages which he seeks in the sum of $9,258.61. His damages were to a house and garage and their contents. He claims, also, for costs of moving, hotel and other rental accommodations, loss of customers due to the flood and depreciation in valuation due to being subject to flood, all as set out in detail in the petition. It is found that the fair and reasonable value of the Cummings’ damage was $4,700. His records were also lost in the 1952 flood and the valuation here determined is based on plaintiff’s own testimony, less the claims deemed to be speculative, consequential or not established by competent evidence.
37. (11) L. E. Daniel, Sr., now deceased, and Mahala Daniel, his wife, Rt. 2, Rushville, Missouri, had a freehold in Buchanan County and as a result of the 1949 flood suffered damages for which $1,245 is claimed. The claimed damage was to a private road, for cleaning the house after the water receded, and for 12 acres of corn, 5 acres of wheat and loss of use of 10 acres of cornland which were too wet to plant. It is found that the fair and reasonable value of the damage suffered by these plaintiffs is $1,235.
38. (12) Clarence R. and Virginia M. Drain, Rt. 6, Rush-ville, Missouri, owned land in Buchanan County, Missouri, described in the petition, and as a result of the flood between January and March 1949 on the Missouri River suffered damages which they itemize in the petition and for which they claim $1,704.85. These figures include 2 squirrel hides, 12 muskrat hides, 2 cords of wood which floated away and for which neighbors down the river thanked plaintiffs, damage to their house and an auxiliary building and their contents, damage to a boat pier and loss of miscellaneous items identified in the petition. Claim is also made for rent, moving, and for depreciation in valuation due to the location now having allegedly been made subject to floods by defendant. It is found that the fair and reasonable value of the damage *363 to these plaintiffs is $1,160. Plaintiffs had lived on this property since 1904 and testified that they had seen floodwater in the yard bnt never in the house prior to 1949.
39. (13) George and Stella Dulcan, St. Joseph, Missouri, owned property described in the petition and as a result of the 1949 flood suffered the loss of one-half of a corn crop on 50 acres and claim damage also for the rehabilitation of this land, all in the sum of $1,900. It is found that the fair and reasonable value of the damages suffered by these plaintiffs is $1,000. Plaintiffs also expended $1,162 for bulldozing the flooded ground but did so in 1952 and 1955 which was subsequent to the 1952 flood. It cannot be determined from the evidence how much of this expenditure should be apportioned to the 1949 flood damage, if any.
40. (14) Elija Embry, deceased, is a plaintiff named in the petition. Substituted by order of the court on November 13, 1957, is his son and only surviving heir, George Douglas Embry, St. Joseph, Missouri. The plaintiff’s property was a leasehold on 80 acres described in the petition. The claim is for $3,515 in damages resulting from the 1949 flood which, allegedly, caused the loss of the use of 75 acres of cornland for one season and the loss of 100 bushels of popcorn in cribs, 40 acres of wheat and 50 chickens. The itemization of acreage above is more than the total leasehold. Additional confusion results from the fact that neither plaintiff nor the deceased testified on this claim. Della Mae Smith, stepdaughter of the deceased, testified that she put in the crop herself but did not testify about the value thereof. On the basis of the stipulation as to value and plaintiff’s stipulation as to the value of popcorn, and allowing plaintiff a tenant’s one-half interest in 40 acres of corn and wheat, the damages would not appear to exceed $2,032 and it is so found.
41. (15) Plaintiff Alva Fulk, Beverly, Missouri, had a leasehold in Platte County, Missouri, described in the petition and on which he grew 147 acres of wheat. In the petition he asks $5,880, the wheat being destroyed by the 1949 flood. Based on the stipulation between the parties as to the value to a tenant of a wheat crop at the time of the flood, it is found that the fair and reasonable value of the damage *364 suffered by plaintiff for the cause shown is the sum of $3,601.
42. (16) Ray Greer, Gladstone, Missouri, in 1949 had a lease on certain land in Buchanan County, Missouri, described in the petition, and as a result of the flood in that year, which is the subject of these findings, suffered damages for which he claims $6,541. Plaintiff had a three-fifths interest in 55 acres of wheat which were destroyed. The parties are agreed that a proper computation would be three-fifths of the owner’s stipulated price of $56 per acre, or $1,848, in damage for lost wheat. As a tenant he would have a one-half interest in the other crops or loss of $100 in alfalfa acreage, $100 in com acreage and $100 for the com in the crib, for a total of $2,148 for lost and damaged crops. In addition, plaintiff suffered the loss of fencing, which he had installed and reserved the right to remove from the property, and damage to certain machinery in the total sum of $555.
Plaintiff also claims for the loss of 99 shoats and 32 brood sows. They were not destroyed by the flood but by the disease of erysipelas which they contracted from infected ground on the farm to which they were removed from the danger of flood. They died over a period of 2 years. Claim is also made for expenses of moving this livestock and plaintiff’s effects and for the damage to pasture. Plaintiff also claims his costs in moving.
It is found that the fair and reasonable value of plaintiff Greer’s damages directly resulting from the 1949 flood does not exceed $2,703.
43. (17) Plaintiff O. T. Harlan, Sr., Et. 1, Halls, Missouri, claims damage in the amount of $14,734 as a result of the flood of 1949. Part of this damage is alleged to be $11,900 for loss of a one-half interest in 340 acres of growing wheat. Mr. Harlan’s interest was the other one-half of the crop referred to in the claim of John H. and Frances F. Cook, No. 8 in the petition, finding 34. Plaintiff’s share of the wheat, as stipulated, was $8,330. In 1949 and for several years prior thereto plaintiff Harlan had leased the 920-acre Cook farm. In addition, plaintiff had a freehold in 70.92 *365 acres described in the petition. No crop loss is claimed on this property.
Plaintiff owned his own Delco light plant which was destroyed and it is found the fair and reasonable value thereof at the time of the flood was $485. He also lost tractor oil and gasoline worth $101. Plaintiff claims $1,000 as the fair value of repair and replacement of parts and cleanup of a tractor. He also claims $1,248 for labor in cleaning the house and his own and the leased land. There is no duplication of this item in claim No. 8. It is found that the fair and reasonable value of damages suffered by plaintiff as a result of the flood of 1949 is the sum of $11,164.
44. (18) Orville T. Harlan, Jr., St. Joseph, Missouri, leased approximately 200 acres of land described in the petition and owned by Ada Bullman. He claims $3,160 in the petition for damages as a result of the 1949 flood. Plaintiff lost his one-half interest in 100 acres of growing wheat. On the basis of the stipulation giving tenants a price of $1.40 per bushel, and figured at the rate of 35 bushels per acre, or the equivalent of $24.50 per acre for a tenant’s share, his damages would be $2,450. Plaintiff also claims damages of $360 for labor cleanup after the flood. The requested findings of the parties agree on $2,810 as the fair and reasonable value of this plaintiff’s damages and it is so found.
45. (19) Eobert C. and Elsie I. Hoagland, St. Joseph, Missouri, owned land in Buchanan County, described in the petition, and suffered damage from the 1949 flood for which they claim $4,364.85. Of this sum $1,024.25 represents alleged damage to plaintiffs’ house, $170 to auxiliary buildings, $155 for loss or damage to contents of these buildings, $405.60 is claimed for the cost of moving and storage after the flood and for rental of other quarters and $2,575 is sought for alleged depreciation in the value of plaintiffs’ property due to being in a location made subject to floods by defendant.
Plaintiffs made a claim on their 1949 income tax return for $1,317.56 damage and loss to their property. This is the fair and reasonable valuation of their damage.
*366 48. (20) Plaintiffs Boy M. Hood and bis wife, Atchison, Kansas, owned property in Buchanan County, described in the petition, and damaged by the flood of 1949. They claim damages of $1,099.26. The damage suffered by plaintiffs is detailed in the petition and is to the land, the house and auxiliary building and their contents, and for the loss of equipment. The sum of $1,099.26 is the fair and reasonable value of the damage.
47. (21) J. D. Hundley, Bt. 1, Atchison, Kansas, claims $2,804 in damages as a result of the 1949 flood in which he alleges the loss of 28 acres of wheat on land he owned and 6 head of cattle. On his 1949 income tax return plaintiff claimed the loss in the flood of 2 cows of a value of $105 and one of a value of $42.50. The latter was destroyed because it broke its leg in the ice. It is found that the fair and reasonable value of Mr. Hundley’s damage is $1,674.
48. (22) Anna Ingersoll, Bt. 6, St. Joseph, Missouri, owned a house and cave identified in the petition and damaged by the 1949 flood. For this damage she claims $1,000 which is found to be fair and reasonable.
49. (23) The L. F. Ingersoll Attraction Lot, St. Joseph, Missouri, was operated for 50 years under lease by Anna Ingersoll and her husband, the latter now deceased. Mrs. Ingersoll became the owner of this amusement park, known locally as “Lake Contrary Park,” only 8 days before the flood of 1949. The park suffered extensive damage due to the flood and plaintiff claims $40,075.99. The damage detailed in the appendix to the petition covers injuries to residences and other buildings, to various amusement devices common to such enterprises, to the contents of buildings, the merchandise and the land. Plaintiff’s records were all destroyed in the 1952 flood. An estimate was made by a contractor familiar with the park business who determined that it would cost $41,077.99 to repair and restore the property. Anna Ingersoll testified that this represented a fair and reasonable estimate except for a piano for which she would deduct $1,100 from the $1,500 claimed on this item in the petition.
Plaintiff paid $25,000 for the land just before the flood. Plaintiff had constructed the buildings on the land and owned *367 all of the items for which damage is claimed. Mrs. Ingersoll estimated that over a 50-year period she and her husband had spent $350,000 on the property and claimed that it had never flooded prior to 1949. Prior to the flood of 1949 plaintiff expended $10,000 to $12,000 annually to put the park in condition for the season. It is found that the fair and reasonable value of plaintiff’s damage is $26,976.
50. (24) Plaintiffs Mr. and Mrs. Albert Jones, Et. 2, Rush-ville, Missouri, owned property identified in the petition and damaged by the 1949 flood. They claim $2,018.24. The fair and reasonable value of their damage is found to be $1,000. No allowance is made for items of alleged damage believed to be consequential or not established by satisfactory evidence, including evacuation losses, rent, nursing care, storage, and miscellaneous items claimed and not identified.
51. (25) Walter Keimig, Atchison, Kansas, owned land damaged by the 1949 flood, identified in the petition, and on which 138 acres of growing wheat and 2 tractors of a depreciated value of $1,000 were destroyed. Plaintiff claims damages of $11,156.50 in the petition. The fair and reasonable value of Mr. Keimig’s damages is $8,728.
52. (26) Frances E. Langston and Eva P. Mansfield of Leavenworth, Kansas, operated as a partnership a summer camp known as Camp Lake Shore, Sugar Lake, Rushville, Missouri. Their freehold is described in the petition. They claim damages from the 1949 flood in the sum of $6,897.97 These alleged damages as itemized in the petition are largely to several cottages. Also claimed is $2,295 for moving, storage, loss of business, and cleanup of the grounds. Plaintiffs had an estimate prepared of the damage and the cost of making repairs and at the trial adopted it as fair and reasonable. The total of this estimate is $3,185. Plaintiffs’ income tax return for 1949, however, claimed only a loss for damage by the flood in the sum of $196.42. Plaintiffs sold the property in 1950 after making repairs. The 1952 flood destroyed their records, presumably at some other location. There is no credible evidence of what expenditures and repairs were actually made. There is no evidence that the *368 property was sold at any loss as a result of the 1949 flood. The fair and reasonable value of plaintiffs’ damage is found to be $200.
53. (27) Flossie F. McQueen. Dismissed.
54. (28) Millard Overton, Et. 1, Atchison, Kansas, in 1949 owned the property described in the petition. As a result of the flood of 1949 plaintiff lost 105 acres of wheat, 20 acres of com and 20 head of hogs for which he claims $7,587.50. The parties have stipulated that the fair and reasonable value of his damages was $7,450 and it is so found.
55. (29) Ealph H. Price, Et. 1, Atchison, Kansas, owned land, described in the petition, which he alleges was covered by the flood of 1949 causing him damages of $13,855 sought here. The plaintiff’s land was on the west or Kansas side of the river and a portion of it was between the Oak Mills Chute and the river on what he described as an island. He alleges that he had a loss of 34 head of cattle worth $11,190, which he could not find after the flood. He claimed a loss of $4,125 on his 1949 income tax return for these cattle, stating that they were drowned. At the trial he could not testify that they were positively killed in this manner. The petition alleges in the alternative that they drowned or froze. Plaintiff testified that they “may have tried to get out and got into the stream or something.”
Plaintiff alleges that he lost 30 acres of wheat of a value of $1,665 in the flood which went over the island and that, in addition, 60 acres were rendered unusable for a year because they were cut off by the water. One of his neighbors who now owns the island and leased part of it in 1949 testified that prior to the flood it was only possible to get to the island across the Oak Mills Chute by boat. He said that the flood water did not get over the island. He did not know whether plaintiff lost any cattle or wheat because of the flood but knew plaintiff had some cattle on the island.
The weight of credible evidence is that plaintiff did not suffer any damage to wheat by reason of flood water nor did the flood make his land on the island any more difficult to get to. No cattle were lost by reason of floodwaters over the *369 island. Plaintiff’s loss of cattle of a value of $4,125 was due to unknown causes.
56. (30) Ada A. Rullman, St. Joseph, Missouri, owned 200 acres described in the petition and claims $9,150 in damages as a result of the flood of 1949. Plaintiff’s house was totally destroyed. She lost a cattle barn, a shed-garage, a wheat crop and 14 acres were either washed away or covered by a heavy layer of sand. The evidence establishes and it is found that the fair and reasonable value of her loss is $9,150 as alleged.
57. (31) Lake Estates, Inc., and S. J. Shepherd, St. Joseph, Missouri, owned property damaged by the 1949 flood and for which $17,089.75 is claimed. There were losses of various crops itemized in the petition, damage to buildings, fences, machinery and miscellaneous equipment. Part of the land was very low land located outside of the levees on accreted land. Except for the claim for pasture, which is found to be excessive, the weight of the evidence establishes and it is found that the damages sustained by plaintiffs total $13,055.75.
58. (32) Gladys Mae Cody and Ben Trackwell, plaintiffs, have been substituted as the only living heirs of Mace Track-well, deceased, who was named in the petition and reference. They claim $5,040 for the loss of growing wheat on 2 parcels of land, one of 46 and the other of 80 acres. This was a leasehold and, based on the stipulated valuation, plaintiffs’ interest in the wheat would be $3,087. The description of the leasehold as set forth in the petition is for “56.4 acres, more or less * * There is no explanation of the discrepancy in the description and of the acreage allegedly lost. As in the Embry claim, finding 40, it is determined that the loss does not exceed the acreage in the description of the property. The tenants’ interest in 56 acres of wheat would be $1,372, which is found to be the extent of damage suffered by plaintiffs as a result of the flood of 1949.
59. For convenience, the following schedule summarizes the amount of damages claimed by each plaintiff and the amount determined to have been established by the evidence with reference to the finding thereon:

*370

 Channel Improvement and stabilization work by defendant has, in general, developed and protected farmlands. Approximately 10,500 acres of accreted land have been created between St. Joseph, Missouri, and Leavenworth, Kansas. At least 27,200 acres of land had eroded away in this area prior to the river work by defendant and the construction of district and private levees.

 There was evidence offered about a flood in April 1949 but none of the damages in this case are found to have resulted from it nor are any findings possible as to its cause.

 Based on the stipulation, her damage would have been $19,950. There Is no amendment to the petition increasing the amount claimed.

 The Initial “It-” la used for Mr. Cook in the body of the petition. It was stipulated at the trial that John H. Cook Is the correct name.