132 So.2d 561 (1961)
Louise PEAIRS and J. Herbert Peairs, her husband, Appellants,
v.
FLORIDA PUBLISHING COMPANY, a corporation, Appellee.
No. C-2.
District Court of Appeal of Florida. First District.
September 6, 1961.
Rehearing Denied September 18, 1961.
Bedell, Bedell & Dittmar, Jacksonville, for appellants.
*562 Howell, Kirby, Montgomery and Sands, and Harold B. Wahl, Jacksonville, for appellee.
CARROLL, DONALD, K., Chief Judge.
The plaintiffs, Louise Peairs and J. Herbert Peairs, her husband, have appealed from a final judgment entered by the Circuit Court for Duval County pursuant to the defendant's motion for a directed verdict made at the close of the plaintiffs' case in the trial.
The plaintiffs alleged in their complaint that prior to November 23, 1957, the defendant, a newspaper publisher, in the course of distributing its papers carelessly and negligently permitted a wire loop used for binding bundles of its papers, to remain and be on the parking lot of a certain restaurant in the City of Jacksonville, and that on that date the plaintiff Louise Peairs, a patron of the said restaurant, while walking from the restaurant to her car in the parking lot, tripped upon the said wire loop and fell, fracturing the bones in both of her wrists. The complaint is in two counts, which are the same except that the first count alleges the plaintiff-wife's injuries and the second count the damages sustained by the plaintiff-husband. In its answer to the complaint the defendant denied the alleged negligence and its consequences, and also denied that it was the defendant which distributed the papers and permitted the wire loop to remain and be on the said parking lot.
The evidence at the trial showed the following facts:
On November 23, 1957, Mr. and Mrs. Peairs the plaintiffs, had dinner at the restaurant mentioned in the complaint and left the dining room at about 8:05 p.m. on that date. Immediately north of the restaurant building there was a black asphalt parking lot provided for the benefit of patrons of the restaurant, and to the north of the lot was a building in which were located four business establishments, including one known as Strat's Garage. Leaving the restaurant, Mr. and Mrs. Peairs walked a few feet on the sidewalk in a northerly direction toward the parking lot and then turned to the left onto the lot in order to reach their automobile, which was parked there. The parking lot was in semi-darkness. Mrs. Peairs paused momentarily to admire the upholstery of one of the parked cars. Mr. Peairs was about three or four steps ahead of her at the time of the fall. In her testimony she thus described her fall:
"* * * I had taken just a few steps from that car when I stepped on something that hit my leg and it startled me and I screamed as the wire hit me, and the next step I took I had both feet entangled in this wire. I struggled for my balance but I went down and it felt like someone had taken a lasso and pulled both feet from under me as I went down so hard; so hard that I could feel my hands crushing my wrists."
Mr. Peairs turned around and found his wife lying face down on the pavement, unable to move and complaining that she had broken her wrists. He then found lying at her feet a wire loop, which they introduced at the trial as their first exhibit.
The defendant, the publisher of a Jacksonville newspaper, distributed its newspapers to route carriers under a carrier lease contract in which the defendant leased to the carrier a certain route, together with its subscription list, and the carrier undertook to deliver the papers to the subscribers on the route. Under this contract the defendant sold the papers to the carrier at a stipulated price and agreed not to interfere with or attempt to control the carrier with respect to the ways, means, or methods of performance, distribution, solicitation, or collection. A copy of such a contract was introduced in evidence by the plaintiffs as one of their exhibits.
Although the evidence was in some conflict as to the exact point at which the defendant had long been dropping bundles of *563 newspapers tied with wire loops, Mr. Peairs testified that the bundles were dropped on or near the sidewalk and scattered in front of the building to the north of the restaurant. These bundles were regularly delivered to the area and set off the truck by the defendant's district manager. Mr. Peairs testified that he frequently saw the defendant's newsboys in the area of the parking lot. When he stopped to purchase a paper on Sundays he ordinarily drove up to the sidewalk on the restaurant side and usually there would be a newsboy or two around there. When the papers were pretty well tied and ready for delivery, Mr. Peairs saw the boys slapping one another with the papers. He usually bought a paper from a newsboy at a point about half-way across the area  within twenty feet of where his wife tripped and fell in the parking lot on the night in question.
There was evidence also that, unless a distribution point was cleaned up, wires and trash would be left about a drop area. It was against the defendant's policy to leave wires and other trash around the distribution points, and the defendant's circulation manager had given instructions to the district managers to see that the wires and trash were picked up at the distribution points. Some of the carrier lease contracts had been terminated by the defendant because of the carriers' failure to pick up trash at the distribution points after being told to do so. If the carriers did not pick up the trash, usually the defendant's district managers would do so.
The defendant's district manager for the area in question testified that he had instructed the carriers to keep the drop areas clean, and that in riding back by the distribution points, if he noticed any trash about the distribution point, he would stop and pick it up. He also testified that on several occasions he found trash and wires about the distribution area in question and afterwards warned the carriers not to leave any more around there.
The operator of Strat's Garage testified that almost every morning, while the defendant was using the area of his garage as a distribution point, he would have to "police up" in front of his garage; and that he had made several complaints to the defendant prior to Mrs. Peairs' fall concerning the defendant's failure to remove the wires and trash. Although the defendant promised him that it would have the matter corrected, no effective action was taken by the defendant, and finally the garage operator asked the defendant to use some other place as a distribution point, whereupon the defendant moved its distribution point about two blocks to the north.
The evidence convincingly showed that the wire which caused Mrs. Peairs to fall was the wire of the defendant. In fact, the trial court, just before granting the defendant's motion for a directed verdict, stated that a jury would be justified in making this finding, and "That is the clearest fact in this case."
Among the exhibits introduced in evidence by the plaintiffs at the trial was a certified copy of an ordinance of the City of Jacksonville declaring it unlawful "for anyone to spit or throw any hulls, peelings, or other litter upon the sidewalks or other public places * * *."
When, at the close of the plaintiffs' case, the trial court granted the defendant's motion for a directed verdict, the court said, "* * * but this is the basis of the Court's feeling, that the carriers themselves were independent contractors and independent of the defendant's negligence for which they alone are responsible." Just before this statement the trial court, in discussing the evidence at the trial on the question of how the wire got from the place where the defendant left it to the place where Mrs. Peairs fell, said, "* * * the most reasonable explanation is that it was impelled to that point by an independent contractor, one of the carriers, in the course of their horseplay."
*564 These statements point up the crux of the question before us on this appeal  did the newspaper carriers bear the relation of independent contractors to the defendant and, if they did, does that fact relieve the defendant of responsibility for their negligent acts?
The question as to whether the carriers are independent contractors can be readily answered, because the Supreme Court of Florida in two cases has held that newspaper carriers working under written contracts substantially similar to those involved in the instant case were independent contractors and not employees. Florida Publishing Company v. Lourcey, 1940, 141 Fla. 767, 193 So. 847, and Miami Herald Publishing Co. v. Kendall, Fla. 1956, 88 So.2d 276. Accordingly, in the consideration of the matters raised on this appeal, we assume and hold that the newspaper carriers here bore the relation of independent contractor to the defendant, and we will discuss the rights of the parties and the applicable law on the basis of such holding.
The view seems widespread among many members of the bar and bench of this state that a person is not liable for the torts committed by his independent contractors. In fact, some encyclopedic treatises declare such to be the rule in this state. Perhaps this notion arose from the large number of automobile accident cases in which our courts have held that there was no liability when the automobile was being operated by an independent contractor. Perhaps the confusion has been unalleviated by some court decisions in which were discussed the test of control of work and the effect such an element has upon liability, without clearly pointing out the exact relationship that developed when such control was present. In any event, we feel it appropriate here to marshal some of the decisions of our courts in which, for various reasons, a person was held liable for the torts committed by his independent contractor, so that we might examine the facts of the present case in the light of the standards recognized as to the several exceptions to the rule of nonliability.
A major apparent exception to the general rule that a person is not liable for the torts of his independent contractor occurs when the employer has the right to direct or control the performance of the work or the manner of its accomplishment, for then the master and servant relationship arises as a basis for imposing liability upon the employer. See Mumby v. Bowden, 1889, 25 Fla. 454, 6 So. 453; St. Johns & H.R. Co. v. Shalley, 1894, 33 Fla. 397, 14 So. 890, and Gulf Refining Co. v. Wilkinson, 1927, 94 Fla. 664, 114 So. 503. This exception, basically considered, is more apparent than real, for, when such control exists, the worker may bear the relation of servant or employee to the employer rather than that of independent contractor. This distinction was clearly delineated by Judge Kanner, speaking for the District Court of Appeal, Second District of Florida, in King v. Young, 1958, 107 So.2d 751, 753, when he wrote the following, which we quote with approval:
"The status of an independent contractor, as distinguished from that of an agent, consists of a contractual relationship by one with another to perform something for him, but the one so engaged is not controlled or subject to the control of the other in the performance of the engagement but only as to the result. Conversely, a principal in an agency relationship retains the right to control the conduct of an agent in regard to the engagement intrusted to him. It may be said that the recognized distinction between an agent and an independent contractor relationship is determined by whether the person is subject to or whether he is free from control with regard to the details of the engagement. See Florida Industrial Commission v. State, 1945, 155 Fla. 772, 21 So.2d 599; and 2 Am.Jur. Agency, Section 8, p. 17."
*565 Another exception to the general rule of nonliability for the torts of an independent contractor arises when the act contracted for is tortious. This exception was recognized by the Supreme Court of Florida in National Rating Bureau v. Florida Power Corporation, 1957, 94 So.2d 809, 811, 64 A.L.R.2d 859, involving a suit to enjoin an electric utility from occupying a certain strip across the plaintiff's lands without payment of damages for cutting certain trees on the strip. The lower court had held that the utility was not liable for damages, as these were the responsibility of an independent contractor, one Hardee, who had done the cutting. The Supreme Court declared:
"The question for us to decide is whether the defendant had the right to cut the trees from the street without compensating the owner of the abutting lands. If the defendant did not have this right then its contract with Hardee was for a tortious purpose and even though Hardee was an independent contractor defendant would be responsible for the damage to the abutting owners, not only for the trees cut in the right-of-way but on the adjacent lands as well. The independent contractor doctrine does not relieve the employer of responsibility for the negligent acts of the contractor where the work to be done under the contract, of itself, operates to injure the property of another. Weinman v. De Palma, 1914, 232 U.S. 571, 34 S.Ct. 370, 58 L.Ed. 733; Mall v. C. & W. Rural Electric Cooperative Ass'n, 1950, 168 Kan. 518, 213 P.2d 993. See Annotation in 21 A.L.R. 1262 and cases there cited, also 27 Am.Jur., Independent Contractors, Sec. 40."
On rehearing, the Supreme Court reiterated its conclusion "that the act contracted for being tortious, the defendant cannot escape responsibility for the acts of the contractor because he was an independent contractor."
A third exception to the general rule of nonliability was recognized by the District Court of Appeal, Second District of Florida, in the recent case of Easton v. Weir, 1960, 125 So.2d 115. In that case the court held that, where a landlord gratuitously or voluntarily assumed the duty of replacing the roof on its building which was occupied by, and under the control of, the tenant, the landlord was under a duty to see that no injury would be sustained by the tenant in the making of the repairs, and the landlord could not absolve itself from liability by employing an independent contractor to make the repairs.
In the case of Burch v. Strange, Fla.App. 1961, 126 So.2d 898, we recognized the foregoing exceptions and held that in an action of trespass, where the trespass is done by an independent contractor, the other party is not liable when the trespass is not authorized in any way by the contract unless such other party controls the work or authorizes the specific act.
In their brief the appellants have called our attention to another recognized exception, which they claim is applicable to the facts of the present appeal  the rule that is stated in 17 Fla.Jur., Independent Contractors, Sec. 5, p. 179, as follows: "Where a company gains knowledge of a dangerous situation created by its independent contractor, it may incur liability through its failure to halt the operation or correct it * * *." Two decisions of the Supreme Court of Florida are correctly cited in support of this rule: Maule Industries, Inc. v. Messana, Fla. 1953, 62 So.2d 737, and Breeding's Dania Drug Co. v. Runyon, 1941, 147 Fla. 123, 2 So.2d 376.
The case of Maule Industries, Inc. v. Messana, supra, involved an action for damages for the destruction of growing crops on land, which the plaintiff leased from the defendant, as a result of flooding allegedly caused by the defendant's pumping operations on its land adjacent thereto. The record showed that the defendant knew the *566 purpose for which the land was to be used by the plaintiff. The defendant was put on actual notice of a flooding situation which was dangerous to the plaintiff's crops. The Supreme Court held that under the circumstances disclosed by the record the defendant-appellant "cannot escape liability and responsibility by claiming that the work was being done by an independent contractor and that appellant had no control over his activities." [62 So.2d 739.]
The courts of this state have recognized several other exceptions, not pertinent here, to the general rule that a person is not liable for the torts of his independent contractor. Some of these other exceptions are discussed in 17 Fla.Jur., Independent Contractors, Section 5, pages 178-181. For example, an employer may be held liable for injuries caused by the failure of an independent contractor to exercise due care with respect to the performance of work which is inherently or intrinsically dangerous.
The appellants have called our attention to a recent decision of the Oregon Supreme Court in Eitel v. Times, Inc., 1960, 221 Or. 585, 352 P.2d 485, 490, involving a factual situation remarkably similar to that in the present appeal. In her action for damages the plaintiff alleged that she tripped over a wire on the sidewalk in front of a bus terminal and received personal injuries as a result of the negligence of the defendant, the publisher of a newspaper at Coos Bay, Oregon. Some of the defendant's papers were sold in North Bend, Oregon, the city in which she tripped on the wire. The plaintiff contended that the wire had been taken from a bundle of newspapers deposited by the defendant on the sidewalk near the scene of the accident and as a result of the defendant's negligent conduct in causing the wire to be left on the sidewalk the plaintiff was injured. At the trial there was substantial evidence to show that the defendant was aware of the conduct of the newsboys in leaving the binder wires on the sidewalk and street. The Supreme Court of Oregon in its opinion discussed at some length the various ways in which the wire could have reached the scene of the accident, stating that it could have been kicked along from another part of the sidewalk by a pedestrian, could have been thrown there by a newsboy or by a child in play or by any other person, or could have been thrown up from the street by a passing vehicle. The Court then went on to say:
"Whether these and other possible causes will help balance the probabilities in favor of the defendant will depend upon the scope of its duty. And its duty is, in part, determined by the seriousness of the hazard created by the wire loops which it used in its business. We are of the opinion that its duty was broad enough to impose liability upon it for harm resulting from the intervening acts of third persons mentioned above. The defendant had actual knowledge of the hazardous condition created by the wires. It was reasonably foreseeable that once the wires were cast aside by the newsboys the hazard would continue, even though the wires were for a time in the street or at a place on the sidewalk which rendered them harmless until another agency again set the hazardous instrument in motion. Foreseeable acts of third persons do not constitute superseding causes."
The Oregon Supreme Court later discussed the nature and extent of the duty of a newspaper publisher which chooses to use the public sidewalks as a place to conduct a part of its business, as follows:
"The case at bar is not unlike those cases in which a person seeks to recover from a merchant for injuries resulting from tripping upon an object on the ground or floor of the business premises. The defendant here was chosen to use the public sidewalk as a place to conduct a part of its business. The duty to keep its business premises free *567 from hazards of its own making is as great if not greater than that of a merchant who conducts his business on private property."
In the Eitel case at the close of the plaintiff's case in chief the defendant moved for an involuntary non-suit, which was denied by the trial court, whereupon the defendant rested. The defendant also requested the court to give an instruction which, said the Supreme Court, was tantamount to a motion for a directed verdict, and the trial court refused to give the requested instruction. The case was submitted to the jury, which returned a verdict for the plaintiff for more than $20,000 damages. The Supreme Court of Oregon affirmed the judgment. Near the end of its opinion the Supreme Court pointed out that direct evidence at the trial established that wires were on the sidewalk on the day of the accident, that defendant's wire tripped plaintiff, and that the defendant knew of the hazardous condition in the past. The Supreme Court then went on to say:
"With this evidence as a foundation we do not think that it is unreasonable to permit an inference that the wire which felled plaintiff came to be where it was through the defendant's conduct and the foreseeable conduct of others."
In the Eitel case the defendant, as in the instant case, contended that it was not liable for the conduct of the newsboys in leaving the wire loops on the sidewalk, for the reason that the newsboys were not its servants but were independent contractors engaged in the business of buying and selling newspapers as independent merchants. The Supreme Court disposed of this contention by saying that it was not necessary to determine this issue, because, assuming that the relationship between the defendant and the newsboys was that of employer and independent contractor respectively, there was nevertheless a sound basis for the defendant's liability on the facts of the case.
In citing and quoting the foregoing decision of the Supreme Court of Oregon, we do so with approval and adopt the rationale of that decision as applicable to the factual situation in the present appeal.
The final subject for our consideration on this appeal is the propriety of the trial court's direction of a verdict for the defendant, which formed the basis for the final judgment appealed from.
In the recent case of Burch v. Strange, Fla.App. 1961, 126 So.2d 898, 901, we had occasion to review and summarize some of the established principles applicable in our courts to the granting of a motion for a directed verdict, as follows:
"Since one moving for a directed verdict admits every reasonable inference favorable to the opposite party that a jury might fairly and reasonably arrive at from the evidence, and since, as we have seen, the jury might have fairly and reasonably inferred from the testimony of the appellant that he was not liable in trespass, the trial court committed error in directing the jury to find that the appellant was guilty of trespass. Under these conditions it is immaterial that there may be substantial evidence before the jury to the contrary even if such evidence to the contrary is ample. The jury, as the triers of the facts, have the right to weigh and consider the conflicting evidence as well as the conflicting inferences that could reasonably be drawn from the evidence in reaching their conclusions on the factual issues.
"The power to direct a verdict should be cautiously exercised, and a motion for a directed verdict should never be granted unless the evidence is such that under no view which the jury might lawfully take of the evidence favorable to the adverse party could a verdict for the latter party be sustained. Metropolitan Life Ins. Co. v. Jenkins, 1943, 152 Fla. 486, 12 So.2d 374; Katz v. Bear, Fla. 1951, 52 So.2d 903.

*568 "A motion for a directed verdict admits for the purpose of such motion the facts in evidence and every reasonable and proper conclusion based thereon which is favorable to the adverse party. Hartnett v. Fowler, Fla. 1957, 94 So.2d 724. One moving for a directed verdict against his opponent admits not only the facts shown by the evidence but also admits every reasonable inference favorable to his opponent that a jury might fairly and reasonably arrive at from the evidence. Cutchins v. Seaboard Air Line R. Co., Fla. 1958, 101 So.2d 857."
Applying these principles to the case before us, we are of the opinion that the jury could have fairly and reasonably concluded from the evidence produced at the trial that the defendant-appellee was liable to the plaintiffs for the negligent acts of the newsboy carriers, even though those carriers bore the relation of independent contractors to the defendant, under one or more of the exceptions to the general rule of nonliability for acts of independent contractors, as discussed above.
We think there was sufficient evidence at the trial from which the jury could have drawn a reasonable inference that the defendant, before the plaintiff-wife was injured, had knowledge that a dangerous situation had been created by the carriers and yet the defendant failed to correct this situation to protect the safety of the walking public in the area in question. The jury could then properly find the defendant liable to the plaintiffs under one of the exceptions discussed above.
Again, there was evidence from which the jury could have lawfully found that the defendant had a duty to keep the sidewalks and the parking area clear of the wires and other trash, that the defendant could not absolve itself from liability by employing independent contractors to "police up" the area in question, and hence that the defendant was liable for the plaintiffs' damages under another of the exceptions stated above.
These questions of fact would, of course, have to be submitted to the jury with appropriate instructions from the trial court concerning the applicable principles involved in the exceptions to the rule of nonliability as set forth herein.
Our conclusion is that the trial court erred in taking the case away from the jury and directing a verdict for the defendant. The final judgment based upon such a directed verdict must be, and it is, reversed and the cause remanded for a new trial.
Reversed and remanded.
STURGIS and WIGGINTON, JJ., concur.