519 F.2d 1184
 FLORIDA EAST COAST RAILWAY COMPANY, Plaintiff-Appellee-Cross-Appellant,
v.
UNITED STATES of America et al., Defendants Third Party
Plaintiffs-Cross-Appellees,
v.
CENTRAL AND SOUTHERN FLORIDA FLOOD CONTROL DISTRICT, and
Troup Bros., Inc., Third Party Defendants-Appellants.
 No. 74-2861.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 29, 1975.
 
 Goble D. Dean, Orlando, Fla., for Central and Southern Fla. Flood Control Dist.
 Ronnie H. Walker, Orlando, Fla., Edna L. Caruso, West Palm Beach, Fla., for Central and Southern Fla. Flood Control Dist. and the U. S.
 Delbridge L. Gibbs, Jacksonville, Fla., for Troup Bros.
 Charles B. Evans, St. Augustine, Fla., Peter J. Nickles, Washington, D. C., for Florida East Coast Ry. Co.
 John L. Briggs, U. S. Atty., Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla. for the U. S.
 William R. Swain, Jacksonville, Fla., for Cross Contracting.
 Appeals from the United States District Court for the Middle District of Florida.
 Before GEWIN, DYER and ADAMS,* Circuit Judges.
 ADAMS, Circuit Judge:
 
 
 1
 In this appeal, which has as its focus the damage done a railroad by the washout of its line near a flood control project, the controversy revolves around the liability of the United States, a flood control district, and a general contractor. The central issues are the immunity of the United States, the jurisdiction of the court on a pendent basis over the contractor, and the alleged negligence of the flood control district.
 
 
 2
 I. Factual Background.
 
 
 3
 Pursuant to authorization under the Flood Control Act of 1948,[1] the United States Army Corps of Engineers (Corps), an instrumentality of the federal government, undertook to implement the congressionally approved Central and Southern Florida Flood Control Project. The purpose of the project was to control high water conditions in the area in question during the rainy season, and to impound additional water in Lake Okeechobee for use during the dry season.[2]
 
 
 4
 Levees 64 and 65 of the flood control project parallel one of the branch lines, known as the K-line, of the Florida East Coast Railway. That portion of the K-line between mileposts 29 and 40.08 runs north to south, along the eastern side of Levees 64 and 65. The interceptor canal adjacent to Levee 64 lies to the north of and flows into the canal adjacent to Levee 65. Between them is Culvert No. 1.[3]
 
 
 5
 At the southern terminus of Levee 65 where its interceptor canal empties into the St. Lucie Canal is Structure 153 which, the district court found, regulates the water level and the rate of flow in the interceptor canals for the two levees. By controlling the flow and level of the water in the interceptor canals, Structure 153 in turn affects the velocity of water draining from the surrounding area.
 
 
 6
 The land both east and west of the stretch of the K-line in question is extremely flat and swampy. Prior to construction of the flood control project, surface waters in the area flowed in a southwesterly direction, under three bridges and through numerous equalizer culverts underlying the railway's roadbed. Between the time it was constructed in 1925 and October 1969, when the first washout in this case occurred, the K-line never suffered a washout or serious erosion, even during hurricanes and other periods of heavy rainfall. Building the levees and the structures appurtenant to them, the trial judge found, destroyed the natural drainage in the area.
 
 
 7
 The Central and Southern Florida Flood Control District (Flood Control District) acquired the land and the right-of-way upon which the project was to be constructed. It assured the Corps that it would hold the United States free from damages resulting from the building and operation of the project, and would maintain and operate the flood control system after its completion.
 
 
 8
 Although the Corps had primary responsibility for the design of the project, the trial judge found that the Flood Control District worked closely with the Corps in the planning stages. The Flood Control District, according to the trial judge, "reviewed, in detail, and commented on the General Design Memorandum . . ., the Detailed Design Memorandum . . . and the Project Plans and Specifications. It was responsible for alignment of the project. . . . The Flood Control District also provided advice and assistance to the Corps with regard to the actual construction of the project." In addition, the Flood Control District furnished 15 per cent of the funds for completing the undertaking.
 
 
 9
 On April 3, 1968, the Corps awarded the principal construction contract to Troup Brothers, Inc. The trial court found that Troup, as the prime contractor, worked under the supervision of the Corps and was responsible for seeing that the project was completed in accordance with the plans and specifications drawn up by the Corps. Troup in turn hired Cross Contracting Company to perform all the excavation work and to install the flood control project structures.
 
 
 10
 During an extraordinarily heavy rainfall on October 29, 1969 a washout occurred at milepost 37.76 on the K-line. The washout resulted from the following: leaving Structure 153 open, removing "earth plugs"3a opposite the railroad's culverts, using temporary culverts of less than design capacity, and failing to maintain water elevation in the Levee 65 canal. Water flowed too rapidly out of the Levee 65 canal, lowering water elevation and ultimately generating high velocity flows from the surrounding area through the railroad's culvert, resulting in its erosion and washout.
 
 
 11
 After the washout of October 1969, the Flood Control District and the Corps recognized the deficiencies in the design of the flood control system. However, neither the Flood Control District nor the Corps warned the railroad or took steps necessary to correct the defects.
 
 
 12
 A second washout occurred at milepost 31.24 on March 26, 1970, again during a rainfall "greatly in excess of normal." 5.9 inches of rain fell in the nine hours immediately preceding the washout, the heaviest such rainfall in 33 years.
 
 
 13
 The March 1970 washout also was the result of leaving Structure 153 open and removing the earth plugs in both levee canals. Consequently, water elevation was not maintained in either of the interceptor canals, and the flow of water into the Levee 64 canal was not adequately controlled. No attempt had been made to prevent erosion in the area between the roadbed and the Levee 64 canal. The rapid passage of water into the canal created a pressure differential between the east and west sides of the railway roadbed and an uncontrolled flow through its culverts. This washout caused the derailment of a Florida East Coast train.
 
 
 14
 The railroad incurred damages of approximately $438,000 as a result of the washouts that took place in October 1969 and March 1970, and because of the derailment that ensued.
 
 
 15
 Florida East Coast, a Florida corporation, filed suit on September 21, 1970, against the United States and Cross, seeking to recover for the losses that were caused by the washouts. Cross filed a third-party complaint against the Flood Control District on July 6, 1971. The United States on March 24, 1972 impleaded Troup as a third-party defendant. Then on May 9, 1972, Florida East Coast amended its complaint to assert claims directly against the two third-party defendants, Troup and the Flood Control District. Troup moved for a dismissal of the allegations by Florida East Coast against it on the ground that the district court had no jurisdiction over those claims, since there is no diversity between Troup and the railroad.
 
 
 16
 The case was tried before the district court, sitting without a jury, from January 8, 1973 to March 13, 1973. Following the trial, judgment was entered in favor of the United States on the ground that the federal government is immune from liability for flood damages in connection with flood control projects. Cross was held liable for the losses that followed from each of the washouts because of its negligence in constructing the flood control system, removing the earth plugs, installing inadequate culverts, and failing to operate Structure 153. It was also liable for nuisance and trespass for its conduct that created conditions of rapid runoff. Troup was found responsible for the actions of Cross, its subcontractor, and, in addition, for failure to supervise Cross.
 
 
 17
 The district court found the Flood Control District liable for permitting the construction of a nuisance on its land and for trespass by reason of the rapid runoff of water it had caused. It was also held liable for negligence as owner of failure to assure that the project was properly designed, constructed and operated, and vicariously as a joint venturer with the Corps. As a joint venturer with the Corps, the Flood Control District was held responsible for the negligence of the Corps with respect to the design, construction, and operation of the project, for nuisance and trespass, and for the activities of Troup and Cross. This last element of liability was predicated upon the nondelegability of the Corps' duty of care with respect to contractors over whom it retained control.
 
 
 18
 Cross appears to have satisfied the judgment of the district court and has not appealed. Troup and the Flood Control District filed appeals from the award of damages against them. Florida East Coast appealed from the judgment in favor of the United States.
 
 
 19
 We affirm the judgment of the district court in all respects.
 
 
 20
 II. Contentions of the Parties.
 
 
 21
 A. Contentions by Florida East Coast.
 
 
 22
 Florida East Coast on its cross-appeal insists that the United States is not immune, under 33 U.S.C. § 702c, from liability for its negligence in the construction of this project. The railroad contends, first, that the statute does not relieve the United States of responsibility for damages resulting from floods created by its own negligence. Also, the damage here, Florida East Coast claims, was not caused by "floods or flood waters" within the scope of the immunity provision, but rather by the rapid runoff of surface waters. Finally, the railroad argues that section 702c has been superseded by the Federal Tort Claims Act.
 
 
 23
 The United States declares in response that section 702c relieves it of liability for damages resulting from all floods, whether the flood is natural or man-made. The events which occasioned the washout of the K-line, the government insists, constitute a "flood" within the intent of the Congress in enacting section 702c. The United States also argues that the immunity provisions of the flood control legislation have not been superseded by the Federal Tort Claims Act.
 
 
 24
 B. Contentions by Troup.
 
 
 25
 Troup argues that the district court did not have jurisdiction over the claims asserted against it by Florida East Coast. The railroad, Troup contends, was able to set forth a claim against it only because Troup had been impleaded by the United States. The federal government, however, Troup declares, was immune. Thus, Troup reasons, the federal claim to which the action against it was appended was a nullity. The suit as to both the United States and Troup, the contractor insists, should, therefore, have been dismissed. Troup also asserts that under the pendent jurisdiction doctrine, even if the original assertion of jurisdiction were valid, the action against it should not have been continued in the district court once the trial court held the United States immune.
 
 
 26
 The uncontroverted evidence adduced at trial, Troup contends, conclusively establishes that any negligence on its part did not contribute to the March 1970 washout, which occurred adjacent to the Levee 64 canal. The testimony is uncontroverted, says Troup, that Culvert No. 1, which controlled the water level in Levee 64, was built in accordance with the specifications and was restraining the water in Levee 64 at the time of that washout.
 
 
 27
 In response, Florida East Coast alleges that, even assuming the validity of the trial court's eventual ruling on the immunity issue, there was at least a substantial question whether, under the facts here, the United States was liable for the damages resulting from the March 1970 washout. Consequently, the railroad urges, its claim against the federal government furnished the district court with the power to adjudicate the railroad's tort claim against Troup. In addition, it was within the discretion of the district court, the railroad maintains, to proceed with the action against Troup when the court, after a prolonged trial, concluded that the United States was immune.
 
 
 28
 Florida East Coast also argues that there was sufficient evidence in the record to support the trial judge's finding of fact that Troup's negligence was one of the causes of the washout.
 
 
 29
 C. Contentions by the Flood Control District.
 
 
 30
 The Flood Control District requests that judgment against it be reversed because it had no authority to direct either the planning or the construction of the project. Without such authority, the Flood Control District claims, it cannot be held liable for the negligence of the United States because it was not part of a joint venture. In addition, the Flood Control District argues that such authority is a prerequisite to holding it liable as a landowner for a trespass by the flood waters or for the creation of a nuisance.
 
 
 31
 The evidence, the Flood Control District continues, was insufficient to establish any negligence by the Corps for which the Flood Control District could be held liable, even if there were a joint venture. Rather, the testimony demonstrates, according to the Flood Control District, that the washout resulted from the railroad's own negligence in replacing several trestles with culverts, thereby drastically reducing the area of the openings through which water could pass under the roadbed. The Flood Control District also submits that the rainfall which preceded the washout of March 1970 was "an Act of God," thus negating the responsibility of any of the defendants.
 
 
 32
 Florida East Coast asserts that the participation by the Flood Control District, as found by the trial judge, constitutes a sufficient basis for holding the Flood Control District liable for the results of the flood, as a joint venturer, as an owner responsible for the negligent design and construction of the flood control system, or as the owner of land on which a nuisance was created. Further, the railraod says that the involvement of the Flood Control District in the project was adequate to hold it liable for the results of a trespass caused by the project.
 
 
 33
 The trial judge, whose findings of fact, according to the railroad, are not clearly erroneous, determined that the washout of March 26, 1970 was not caused solely by the occurrence of a natural and unprecedented event. Therefore, the railroad asserts, the defendants are not entitled to an Act of God defense.
 
 
 34
 III. The Immunity Issue.
 
 
 35
 Florida East Coast submits that the district court erred in several respects in determining that the United States is statutorily immune from liability for damages resulting from the government's negligence in the planning or installation of a flood control project.
 
 Section 702c provides in pertinent part:
 
 36
 No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place . . . .[4]
 
 
 37
 Section 702c, the railroad contends, insulates the government from liability only with respect to natural, as opposed to artificially precipitated, floods. The federal courts, however, have reached a consensus that the United States is protected from liability for damages caused by " floods or flood waters" in connection with flood control projects, even when the government's own negligence has caused or aggravated the losses.[5] There are decisions which impose liability on the United States for damages from flooding, but such decisions do not involve flood control projects within the contemplation of section 702c.[6] Rather the subjects of such suits are drainage facilities incidental to other government installations, navigation projects, and government conduct "wholly unrelated to any act of Congress authorizing expenditures of federal funds for flood control, or any act taken pursuant to such authorization."[7] Decisions that lie beyond the scope of section 702c cannot be understood to limit the immunity of the federal government for flood damage in connection with projects like the one present here.
 
 
 38
 Moreover, contrary to the argument pressed by Florida East Coast, this individualized provision concerning federal immunity was not implicitly repealed by the passage of the Federal Tort Claims Act.[8] The Tort Claims Act[9] lists the statutes specifically revoked thereby, and section 702c is not among them. There is little specific evidence concerning the legislative intent undergirding section 702c.[10] It would appear, however, that in view of the enormous cost of a broad flood control program, and the potential for immense liability if the United States were held responsible for negligent construction, Congress wished to impose a ceiling on the total cost of the enterprise.[11] Therefore, we must conclude, with the Eighth Circuit, that
 
 
 39
 when consideration is given to the basic importance of section (702c) to the vast federal flood control appropriations and undertakings, it should not lightly be assumed that the fundamental policy was reversed by mere implication . . . .[12]
 
 
 40
 The railroad contends, however, that the conditions of section 702c immunity were not met here because the washouts were not caused by "floods or flood waters" as required by the Act. Instead, claims the railroad, the washouts were caused by rapid surface water runoff drawn under the roadbed and into the negligently designed and negligently built interceptor canals.
 
 
 41
 We conclude that Congress intended to insulate the United States from the type of liability asserted here. In enacting section 702c Congress granted immunity to the United States in "the broadest and most emphatic language,"[13] protecting it against "liability of any kind . . . for any damage from or by floods or flood waters . . . .[14] Congress did not limit this immunity to damage done directly by inundation, but provided for immunity also from damage resulting "from . . . flood waters."
 
 
 42
 The damages in question here occurred adjacent to a federal flood control project as a consequence of its design and operation. According to the trial judge, one of the contributing factors was a heavy rainfall so extraordinary that the region was declared a flood disaster area. In Stover v. United States, the trial judge defined a flood as "water which inundates an area of the surface of the earth where it ordinarily would not be expected to be," and as "(w)ater which has overflowed the natural banks of the stream in its natural channel . . . ."[15] The railroad reasons that because the water that caused the damage was not overflow water from the interceptor canals, it was not flood water at all, but surface water. The Stover definition, however, is not restrictive; the term "floods and flood waters" as used in section 702c is sufficiently comprehensive to encompass the extraordinary rising of waters even in a place where water may often be found, such as the swampy area around the K-line.[16] This is particularly true when the site of the rising waters is within a larger region designated a flood disaster area. In both instances the damage done to the railroad, though not the result of inundation of the line itself, resulted from the presence of flood waters around its roadbed.
 
 
 43
 It does not seem reasonable to hold that Congress intended to create immunity for damages which occur when waters within a flood control area leave their normal course, but at the same time intended to permit liability for damage from the increased flow of flood water through its normal channels. Yet, to sustain the railroad's argument would require us to so interpret section 702c. This we decline to do. Accordingly, we affirm the district court's conclusion that, within the factual context presented here, the United States is immune.
 
 
 44
 IV. Pendent Jurisdiction.
 
 
 45
 Troup contends that there was no jurisdiction in the district court to adjudicate the allegations by Florida East Coast that Troup's negligence caused the March 1970 washout and derailment. The railroad concedes that its suit against Troup is based on state rather than federal law, and that there is no diversity of citizenship between them. The tort law claim, however, the railroad maintains was within the pendent jurisdiction of the district court because it arises from the same facts as the railroad's cause of action against the United States and the federal government's third-party claims against Troup and the Flood Control District.
 
 
 46
 Since it is clear that there was no diversity jurisdiction regarding the claim by Florida East Coast against Troup, we address the only viable basis for asserting the claim in a federal court pendent jurisdiction. The theory underlying pendent jurisdiction was first expounded in 1933 in Hurn v. Oursler.[17] The elements of the doctrine, however, may be traced back to Chief Justice Marshall's decision in Osborn v. Bank of the United States,[18] which surveyed the extent of the constitutional grant of jurisdiction in "all Cases . . . arising under . . . the Laws of the United States . . .." Although the Hurn opinion was often viewed restrictively, limiting pendent jurisdiction to cases where federal and state claims were essentially only different labels for the same "cause of action,"[19] the Supreme Court has now rejected an "unnecessarily grudging" approach to pendent jurisdiction.[20]
 
 
 47
 The leading case on pendent jurisdiction is United Mine Workers v. Gibbs.[21] Gibbs had complained that union conduct which damaged his business was both an illegal secondary boycott within the meaning of federal labor legislation and a tortious interference with his contract rights, a cause of action under state law. The Supreme Court held that because the district court had jurisdiction over the federal issue, it also was authorized to decide the state tort law claims. "Pendent jurisdiction," the Supreme Court said, "in the sense of judicial power, exists whenever there is a claim 'arising under the Constitution, the Laws of the United States, and Treaties made . . . under their Authority . . .,' and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case'."[22]
 
 
 48
 The Supreme Court explained that the first prerequisite to the power of a federal court to resolve a state issue is that there be present a claim involving a substantial federal question. The second condition is that the state and federal claims "derive from a common nucleus of operative fact." Finally, the two claims must be such that, were it not for their disparate federal and state character, the plaintiff would ordinarily be expected to try them in one proceeding.[23]
 
 
 49
 Florida East Coast's complaint satisfies all the criteria articulated in Gibbs for extending the power of a district court to the adjudication of a plaintiff's state law claim against a nondiverse defendant. The railroad's complaint stated a claim under the Federal Tort Claims Act, thus invoking the district court's jurisdiction over a "substantial federal question." The test for substantiality has generally been framed in the inverse. A complaint raising an issue of federal law is not sufficient to invoke the jurisdiction of a federal court if the federal claim asserted can be described as, inter alia: " 'so attenuated and unsubstantial as to be absolutely devoid of merit;' " " 'obviously frivolous;' " or " 'no longer open to discussion.' "[24]
 
 
 50
 "The question may be plainly unsubstantial, either because it is 'obviously without merit' or because 'its unsoundness so clearly results from the previous decisions of (the Supreme Court) as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.' "[25]
 
 
 51
 The question whether the United States was immune from liability for the result of its negligence and particularly whether the damages to Florida East Coast were caused by "floods or flood waters" within the meaning of section 702c was not so clearly established as to render the claim unsubstantial,[26] requiring as it did a resolution of factual as well as legal questions. The district court was not deprived of jurisdiction because it eventually concluded that the railroad could not recover from the United States. The jurisdiction of the district court is dependent upon the substantiality of the claims stated in the complaint, not by plaintiff's ultimate right to judgment.[27]
 
 
 52
 The second prerequisite for pendent jurisdiction is that the state and federal claims "derive from a common nucleus of operative fact." The claims by the railroad against the United States and against Troup both arise out of the same two washouts of the K-line, which are alleged to have been caused by negligence in the design and construction of the flood control system. Both Troup and the Corps were intimately involved in the installation of that system. The issue of federal immunity depended on complex factual issues regarding the causes of the washout. Therefore, a substantial number of the factual issues concerning both the United States or Troup were common to both.
 
 
 53
 Finally, the claims asserted by the railroad against the government and Troup were such that, apart from their federal and state origins, one would ordinarily expect that they would all be tried at one hearing.
 
 
 54
 This case is admittedly somewhat different from Gibbs in that the federal and state claims are not asserted against the same party. The Supreme Court declined in Moor v. County of Alameda to decide whether pendent jurisdiction envelops a plaintiff's state law claim against a third party who is not involved in any cause of action over which there is an independent basis for federal jurisdiction.[28] This Circuit, however, like several others, has held that the doctrine of pendent jurisdiction may be invoked to join a new party even though the only cause of action in which the new party is inculpated is a state claim pressed by plaintiff.[29] In Connecticut General Life Insurance Co. v. Craton, for instance, this Court ruled that the district court had pendent jurisdiction over a contract claim asserted by a union against an insurance carrier because there was federal question jurisdiction over the union's suit against the employer concerning the duty of the employer under the collective bargaining agreement to purchase specified insurance benefits for employees.[30]
 
 
 55
 The opinion in Moor does not appear to invalidate this Court's position in Connecticut General Life.[31] Although the Supreme Court observed in Moor that the practice of allowing the joinder of "pendent parties" is a subtle and complex question with far-reaching implications, it also noted that the Ninth Circuit "stands virtually alone" among the courts of appeal in declining to exercise such jurisdiction.[32] The Ninth Circuit's position, however, was largely bottomed on a decision reached before the Supreme Court expanded pendent jurisdiction in Gibbs.[33] The practice of exercising pendent jurisdiction is also supported, the Supreme Court said, by "substantial analogues in the joinder of new parties under the well-established doctrine of ancillary jurisdiction in the context of compulsory counterclaims under Fed.Rules Civ.Proc. 13(a) and 13(h), and in the context of the third-party claims under Fed.Rule Civ.Proc. 14(a)."[34]
 
 
 56
 It is not necessary here to reaffirm the full reach of the holding in Connecticut General. In the present case, the district court did not "bring an entirely new party into (the) litigation."[35] Troup was already before the court, having been impleaded by the United States. Troup concedes that the district court had ancillary jurisdiction over the third-party claim against it.[36] Therefore, the amendment to Florida East Coast's complaint which added Troup as a defendant did not bring a new party into the litigation, as in Moor, but only, as in Gibbs, joined an additional claim under state law to the causes of action already before the court. Where no new party is interjected into a federal case by a state law claim, power to decide the state law claim would appear to reside in the federal court pursuant to the pendent jurisdiction doctrine, notwithstanding that the state and federal claims were not asserted against the same party.
 
 
 57
 Given the power to resolve the controversy between the railroad and Troup, the district court did not abuse its discretion by exercising that power. As enunciated in Gibbs, the purposes underlying the doctrine of pendent jurisdiction are threefold: "judicial economy, convenience and fairness to litigants . . . ."[37] On the basis of the original complaint and the third-party complaint of the United States, it would appear that the question of Troup's liability would be at issue before the district court in any case. The railroad's state claim against Troup is obviously entangled with both its claims against the other defendants and the rights of the defendants among themselves as joint tortfeasors. Failure by the trial court to consider the state claim might have subjected all of the litigants except the United States to the costly and time-consuming exercise of a second trial, while putting Florida East Coast at an unfair disadvantage in its proof in this case because Troup and the Flood Control District would not have been susceptible to examination by, or liability to, Florida East Coast. In these circumstances, and especially in view of the actual length of the trial, the furtherance of the three interests set forth in Gibbs would be adequate reason for declaring that the district court did not abuse its discretion in considering the railroad's claim against Troup.[38]
 
 
 58
 A further ground for upholding the district court's exercise of jurisdiction over the railroad's suit against Troup is that the federal forum is the only forum in which Florida East Coast can possibly obtain in one proceeding a decision on all its causes of action arising from the washout. If the federal government can be sued, jurisdiction abides in a federal court exclusively.[39] Thus Florida East Coast is unlike the majority of plaintiffs who seek to append state claims to federal questions in that it does not have the option of going to state court if it wishes to have all its claims resolved at once. Moreover, this is not a case where the tail wags the dog: measured by the damages alleged, the federal claim by Florida East Coast is fully as substantial as its state claim against Troup. Therefore, the joinder of an additional state claim is particularly appropriate where, as here, the federal claim cannot be decided by a state court. Despite what may seem an intrusion on Florida's jurisdiction over state claims between Florida citizens, the efficiency of the judicial system as a whole, state as well as federal, would appear to be best served by trying the factual issues regarding the cause of the washouts only once.
 
 
 59
 Nor did the trial judge, as Troup asserts, abuse his discretion by not dismissing Troup when he concluded that the United States was immune. In Rosado v. Wyman,[40] the complaint originally challenged a state public assistance law on the grounds that it contravened a federal statute and violated the Constitution. The constitutional issue furnished the district court with jurisdiction over the controversy. However, the Supreme Court treated the case as one in which the district court had only pendent jurisdiction over the statutory question. After the district court had conducted hearings and argument, the constitutional issue was declared moot prior to the court's resolution of the pendent statutory issue. The Supreme Court stated that the power of the district court to decide the pendent claim continued even after the determination of the constitutional question. The trial court also, the Supreme Court concluded, had not abused its discretion in proceeding on the statutory matter. The prior mootness of the constitutional challenge, the Court said, had been properly considered a factor affecting the district court's discretion rather than its power. The Supreme Court gave the following explanation for its holding:
 
 
 60
 We are not willing to defeat the commonsense policy of pendent jurisdiction the conservation of judicial energy and the avoidance of multiplicity of litigation by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim. The Court has shunned this view.[41]
 
 
 61
 Several circuits have ruled that it is within the discretion of the district court to decide the pendent issue even though the basic federal issue has been resolved before trial.[42]
 
 
 62
 In the present case, the decision concerning the immunity of the federal government from liability for its negligence was not made, and apparently could not have been made, until after the close of evidence in a trial which extended over a month. Accordingly, we cannot say that the trial judge abused his discretion in ruling that in view of the substantial energy that had already been expended on the case by both the court and the litigants judicial economy, convenience and fairness to the litigants would be better served by proceeding to determine the state cause of action.[43]
 
 
 63
 V. Liability of Troup.
 
 
 64
 Troup also contends that, even if it were negligent in the manner in which it constructed the project, the evidence does not support the finding by the trial judge that Troup's negligence was a contributory factor in the washout at issue. Upon a thorough review of the record, however, we conclude that the findings of the trial judge in this regard were not clearly erroneous.[44]
 
 
 65
 VI. Liability of the Flood Control District.
 
 
 66
 The Flood Control District argues that it should not be held liable on the grounds of vicarious liability, negligence, nuisance or trespass because it had no control or authority over the design of the project or its construction.
 
 
 67
 Florida law, of course, governs the dispute between the railroad and the Flood Control District. Despite the participation of the Flood Control District in the design, construction and operation of the flood control project, it is at least questionable whether its participation was sufficient to render it a joint venturer for purposes of vicarious tort liability.[45]
 
 
 68
 Nevertheless, we find the Flood Control District liable independently of the activities of the Corps, on the basis of its own participation in the design, construction, and operation of the project. Although it had no contractual obligation to cooperate with the Corps in these matters, the Flood Control District, as the trial court found, worked closely with the Corps, reviewing in detail the design memoranda and plans. The design memoranda, it was found, failed, as a result of negligence, to include adequate measures to preserve the natural drainage in the area.
 
 
 69
 The Flood Control District provided advice and assistance throughout the construction phase, making recommendations and suggestions that the Corps adopted. It was the Flood Control District that requested Structure 153 be left open, and the trial court found this circumstance to be a contributing cause of both washouts. Moreover, soon after the October washout and before the March washout and derailment, the focus of this appeal, the Flood Control District realized the inherent deficiencies in the design that threatened erosion of the K-line, but took no steps to correct the defects or to warn the railroad regarding them.
 
 
 70
 The active participation of the Flood Control District is clear and sufficient to create responsibility; equally manifest is the breach of duty owed the railroad. By sharing in the negligent design and construction of the project, the Flood Control District, in conjunction with the Corps and the contractors, changed the natural flow of waters, causing damage to the adjacent railroad.[46] It is not determinative that the damage was caused by excessive runoff through the plaintiff's property toward the project, rather than by flooding from overflow away from the canal. Once on notice of the risk of injury to the rail line the Flood Control District was obliged to intervene with the Corps to forestall further damage.[47]
 
 
 71
 The Flood Control District is also liable for helping to create a nuisance on its land[48] in the form of its defective interceptor canal system, and for causing surface water to flow at an accelerated rate through and against the railway's roadbed, thereby participating in trespass as well.[49]
 
 
 72
 Since there are a number of bases for liability, we need not address the issue whether the construction of a flood control project in these circumstances was such inherently dangerous work that yet another ground for liability of the Flood Control District as owner of the project site may be established.[50]
 
 
 73
 VII. Act of God.
 
 
 74
 The Flood Control District's final contention is that the rainfall preceding the March 1970 washout and derailment was an Act of God, negating the District's responsibility for the damage done to the railroad. We agree with the trial court's conclusion that the Act of God defense is not available in this case. It has not been demonstrated that the trial court was clearly in error[51] in regarding the rainfall as merely unusual or unexpected, but not "unprecedented," as required for the Act of God defense.[52]More significantly, however, there was ample basis in the record to permit the conclusion that the rainfall was not the sole proximate cause of the damage to the railroad line. And unless the natural event is the sole proximate cause, the Act of God defense is inapposite.[53]
 
 
 75
 The judgment of the district court is affirmed in all respects.
 
 
 76
 Affirmed.
 
 APPENDIX A
 
 77
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 *
 Of the Third Circuit, sitting by designation
 
 
 [1]
 62 Stat. 1175, 1176
 
 
 [2]
 H.R.Doc. No. 643, 80th Cong., 2d Sess. (1948)
 
 
 [3]
 A sketch of the project area is included as Appendix A
 3a Earth plugs are unexcavated sections of a canal or ditch, employed to control drainage.
 
 
 [4]
 33 U.S.C. § 702c (1970)
 
 
 [5]
 See, e. g., Parks v. United States, 370 F.2d 92 (2d Cir. 1966); Stover v. United States, 332 F.2d 204 (9th Cir.), cert. denied 379 U.S. 922, 85 S.Ct. 276, 13 L.Ed.2d 335 (1964); B. Amusement Co. v. United States, 180 F.Supp. 386, 148 Ct.Cl. 337 (1960)
 
 
 [6]
 Seaboard Coastline R. R. Co. v. United States, 473 F.2d 714 (5th Cir. 1973); Graci v. United States, 456 F.2d 20, 25-27 (5th Cir. 1971); Peterson v. United States, 367 F.2d 271, 275-76 (9th Cir. 1966); Valley Cattle Co. v. United States, 258 F.Supp. 12, 16 (D.Haw.1966). See McClaskey v. United States, 386 F.2d 807, 808 n. 1 (9th Cir. 1967)
 
 
 [7]
 Peterson, 367 F.2d at 275. Cf. Graci v. United States, 496 F.2d 20, 25-27 (5th Cir. 1971)
 
 
 [8]
 Parks v. United States, 370 F.2d 92 (2d Cir. 1966); Stover v. United States, 332 F.2d 204 (9th Cir.), cert. denied 379 U.S. 922, 85 S.Ct. 276, 13 L.Ed.2d 335 (1964); National Mfg. Co. v. United States, 210 F.2d 263 (8th Cir.), cert. denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108 (1954); B. Amusement Co. v. United States, 180 F.Supp. 386, 148 Ct.Cl. 337 (1960); Villarreal v. United States, 177 F.Supp. 879 (S.D.Tex.1959)
 
 
 [9]
 60 Stat. 842, 846-847
 
 
 [10]
 Graci v. United States, 456 F.2d 20, 23 (5th Cir. 1971)
 
 
 [11]
 Clark v. United States, 218 F.2d 446, 451-52 (9th Cir. 1954); Graci v. United States, 456 F.2d 20, 25 (5th Cir. 1971)
 
 
 [12]
 National Mfg. Co., 210 F.2d at 274
 
 
 [13]
 National Mfg. Co., 210 F.2d at 270
 
 
 [14]
 33 U.S.C. § 702c (1970)
 
 
 [15]
 204 F.Supp. 477, 485 (N.D.Cal.1962), aff'd 332 F.2d 204 (9th Cir.), cert. denied 379 U.S. 922, 85 S.Ct. 276, 13 L.Ed.2d 385 (1964)
 
 
 [16]
 Cf. 42 U.S.C. § 4121(c) (Supp. III 1973), which defines flood, for the purposes of the national flood insurance program, to include:
 the collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels . . . .
 
 
 [17]
 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933)
 
 
 [18]
 9 Wheat. 738, 22 U.S. 738, 6 L.Ed. 204 (1824)
 
 
 [19]
 Note, The Evolution and Scope of the Doctrine of Pendent Jurisdiction in the Federal Courts, 62 Colum.L.Rev. 1018, 1028-30 (1962)
 
 
 [20]
 United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)
 
 
 [21]
 Id
 
 
 [22]
 Id. at 725, 86 S.Ct. at 1138
 
 
 [23]
 Id
 
 
 [24]
 Hagans v. Lavine, 415 U.S. 528, 536-37, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974)
 
 
 [25]
 Id. at 537, 94 S.Ct. at 1379
 
 
 [26]
 For the standard of substantiality, see Levering & Garrigues Co. v. Morin, 289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933), to the effect that
 the federal question averred may be plainly unsubstantial either because obviously without merit, or "because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy."
 For a measure of the uncertainty about the applicability of section 702c, see Atkinson & Co. v. Merritt, Chapman & Scott Corp., 126 F.Supp. 406, 409 (N.D.Cal.1954); Peterson v. United States, 367 F.2d 271, 276 (9th Cir. 1966).
 
 
 [27]
 Hagans, 415 U.S. at 542, 94 S.Ct. 1372; Gibbs, 383 U.S. at 727, 86 S.Ct. 1130; Mobil Oil Corp. v. Kelley, 493 F.2d 784, 786 (5th Cir. 1974)
 
 
 [28]
 411 U.S. 693, 715, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973)
 
 
 [29]
 See, e. g., Almenares v. Wyman, 453 F.2d 1075, 1083-85 (2d Cir. 1971); Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800, 809-10 (2d Cir. 1971); Nelson v. Keefer, 451 F.2d 289, 291 (3rd Cir. 1971); Beautytuft, Inc. v. Factory Insurance Ass'n, 431 F.2d 1122, 1128 (6th Cir. 1970); Hatridge v. Aetna Casualty & Surety Co., 415 F.2d 809, 816-17 (8th Cir. 1969)
 
 
 [30]
 405 F.2d 41 (5th Cir. 1968). See also Shannon v. United States, 417 F.2d 256 (5th Cir. 1969)
 
 
 [31]
 But cf. Mobil Oil Corp. v. Kelley, 493 F.2d 784, 789 (5th Cir. 1974)
 
 
 [32]
 411 U.S. at 713-14, 93 S.Ct. 1785
 
 
 [33]
 See Hymer v. Chai, 407 F.2d 136 (9th Cir. 1969); Kataoka v. May Department Stores Co., 115 F.2d 521 (9th Cir. 1940)
 
 
 [34]
 Moor, 411 U.S. at 714-15, 93 S.Ct. at 1798. Compare Gibbs, 383 U.S. at 722-23, 86 S.Ct. 1130
 
 
 [35]
 Id. at 713, 93 S.Ct. at 1797
 
 
 [36]
 See Id. at 715, 93 S.Ct. 1785; Dery v. Wyer, 265 F.2d 804 (2d Cir. 1959); Southern Milling Co. v. United States, 270 F.2d 80, 84 (5th Cir. 1959)
 
 
 [37]
 Gibbs, 383 U.S. at 724, 726, 86 S.Ct. at 1139
 
 
 [38]
 See Hart & Wechsler, The Federal Courts (Bator, et al. eds.) (1973) 922-23; Shakman, The New Pendent Jurisdiction of the Federal Courts, 20 Stan.L.Rev. 262, 273-74 (1968); Baker, Toward a Relaxed View of Federal Ancillary and Pendent Jurisdiction, 33 U.Pitt.L.Rev. 759, 784 (1972)
 
 
 [39]
 28 U.S.C. § 1346(b) (1970)
 
 
 [40]
 397 U.S. 397 at 402, 90 S.Ct. 1207, 25 L.Ed.2d 442. See King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968)
 
 
 [41]
 397 U.S. at 405, 90 S.Ct. at 1214
 
 
 [42]
 General Corrugated Box Corp. v. National Kraft Container Corp., 427 F.2d 499, 501 n. 1 (2d Cir. 1970); Springfield Television, Inc. v. Springfield, 462 F.2d 21, 23-24 (8th Cir. 1972); Gray v. International Ass'n of Heat & Frost Insulators & Asbestos Workers, Local # 51, 447 F.2d 1118, 1120 (6th Cir. 1971)
 
 
 [43]
 See O'Connell v. Economic Research Analysts, Inc., 499 F.2d 994, 996 (5th Cir. 1974)
 
 
 [44]
 Fed.Rule Civ.Proc. 52; Zenith Corp. v. Hazeltine, 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)
 
 
 [45]
 One essential element of a joint venture under Florida law is that the parties have equal authority. Yokum v. Rodriguez, 41 So.2d 446, 448 (Fla.1949). The Flood Control District, while it could make suggestions, could not issue directives to the Corps. The Corps had primary responsibility for the design of the project and supervised its construction; the Flood Control District could not bind the Corps in any way sufficient to create equality of authority. Nor did the Flood Control District and the federal government agree to share any losses related to the project, another basic element of joint venture in Florida. Kislak v. Kreedian, 95 So.2d 510, 515 (Fla.1957). Indeed, the government required that the Flood Control District hold it free of all losses. If the participation of the Flood Control District does not raise it to the status of joint venturer, it would bear no vicarious liability for the negligence of the Corps
 The district court's reliance on New York cases appears questionable. Even with respect to the relation of flood control districts to the federal government, however, the highest New York authority holds that there is no joint venture, for purposes of tort liability, between a flood control district and the federal government. Central New York Broadcasting Corp. v. State, 3 A.D.2d 128, 158 N.Y.S.2d 650 (1957).
 
 
 [46]
 See Lawrence v. Eastern Air Lines, 81 So.2d 632 (Fla.1955); Gwinn v. Andrews, 310 So.2d 424 (Fla.Ct.App.1975); New Homes of Pensacola, Inc. v. Mayne, 169 So.2d 345 (Fla.Ct.App.1964)
 
 
 [47]
 Maule Industries v. Messana, 62 So.2d 737 (Fla.1953); Peairs v. Florida Publishing Co., 132 So.2d 561 (Fla.Ct.App.1961)
 
 
 [48]
 See Lawrence v. Eastern Air Lines, 81 So.2d 632 (Fla.1955). Cf. Adler Co. v. Pruitt, 169 Ala. 213, 53 So. 315 (1910)
 
 
 [49]
 See North Dade Water Co. v. Adken Land Co., 130 So.2d 894 (Fla.Ct.App.1961)
 
 
 [50]
 We note in this regard that the doctrine of Rylands v. Fletcher, L.R. 3 H.L. 330 (1968), imposing on the owner strict liability for damages resulting from nonnatural or abnormally dangerous use of land, has recently been revived in Florida. Cities Service Co. v. State, 312 So.2d 799 (Fla.Ct.App.1975)
 
 
 [51]
 Fed.R.Civ.P. 52(a), 28 U.S.C. (1970); Chaney v. Glaveston, 368 F.2d 774 (5th Cir. 1966)
 
 
 [52]
 Davis v. Ivey, 93 Fla. 387, 112 So. 264 (1924). Although the rainfall was the heaviest of its kind in the meteorological records, those records had been kept for only 33 years and it was proper for the trial court to consider that fact in arriving at its decision
 
 
 [53]
 Atlantic Coastline R. Co. v. Hendry, 112 Fla. 391, 150 So. 598 (1933)